## STATE v. GREENE.

No. 2045.    Decided December 2, 1910.    On Application for Rehearing, April 19, 1911 (115 Pac. 181).

1. ADULTERY—MARRIAGE OF ACCUSED—SUFFICIENCY OF EVIDENCE.    In a prosecution for adultery, evidence *held* to justify a finding that accused was a married man.    (Page 395.)

2. ADULTERY—MARRIAGE OF ACCUSED—EVIDENCE—ADMISSIONS.    In a prosecution for adultery, where proof of the marriage of accused is essential, the fact may be proved by his admissions.[1]    (Page 395.)

3. ADULTERY—ELEMENTS—MARRIAGE OF PARTIES.    Under Comp. Laws 1907, section 4210, punishing adultery, and providing that, when the act is committed between a married woman and an unmarried man, both parties shall be deemed guilty of adultery, and that, when the act is committed between a married man and an unmarried woman, the man shall be deemed guilty of adultery, proof that accused was married to a woman other than prosecutrix, and that he had sexual intercourse with the latter, was sufficient to show him guilty of adultery, whether prosecutrix was married or not.    (Page 395.)

4. CRIMINAL LAW—EVIDENCE—ADMISSIONS.    In a prosecution for adultery, an affidavit signed by prosecutrix to the effect that she was the mother of a child, that accused was its father, that she was unmarried, and had had sexual intercourse with accused at divers times, and which was shown to accused when he was arrested, whereupon he stated that he had had sexual intercourse with prosecutrix, but did not believe the child was his, was admissible in evidence, not as primary evidence of the facts therein declared, but to show his admissions respecting the statements contained in it.    (Page 396.)

[1] State v. Moore, 105 Pac. 293.

5. ADULTERY—CORPUS DELICTI—SUFFICIENCY OF EVIDENCE. In a prosecution for adultery, the *corpus delicti* was sufficiently shown by proof that prosecutrix, an unmarried woman, gave birth to a child, and accused's admission that he had sexual intercourse with her was sufficient to connect him with the offense. (Page 397.)

6. CRIMINAL LAW—APPEAL—REVIEW—HARMLESS ERROR. Where there was sufficient competent evidence to show that a witness whose testimony was taken at a former trial was on a subsequent trial beyond the jurisdiction of the court, whether other evidence bearing on such fact was properly received was immaterial. (Page 397.)

7. CRIMINAL LAW—RIGHT TO CONFRONT WITNESSES—CONSTITUTIONALITY. Comp. Laws 1907, section 5013, authorizing the admission in a criminal case of testimony taken at a former trial, where the witness is dead or beyond the jurisdiction of the court, etc., does not conflict with Const., art. 1, section 12, giving accused the right to be confronted by witnesses against him. (Page 398.)

8. ADULTERY—VENUE—SUFFICIENCY OF EVIDENCE. In a prosecution for adultery, evidence *held* sufficient to show that the offense was committed in the county charged. (Page 398.)

9. CRIMINAL LAW—VENUE—EVIDENCE. In a criminal case, the venue may be inferred from circumstantial evidence as well as proved by direct evidence. (Page 398.)

10. WITNESSES—COMPETENCY—COUNTY ATTORNEY. Under Comp. Laws 1907, section 3412, providing that all persons without exception, other than is specified in the next two sections, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, and section 3413 specifying as persons who cannot be witnesses those of unsound mind, children under ten years of age, and parties to transactions with deceased persons, the county attorney, who was of counsel in behalf of the state in a criminal case and participated in the trial thereof after his term of office expired, and to whom accused made certain admissions, was a competent witness. (Page 400.)

11. CRIMINAL LAW—ADMISSIONS—VOLUNTARY CHARACTER. Evidence *held* to show that certain admissions by accused were voluntarily made. (Page 401.)

12. CRIMINAL LAW—EVIDENCE—PART OF CONVERSATION. Under the rule that, where a part of a conversation or transaction relative to a subject under judicial investigation is admissible, all that forms a part of such conversation or transaction together with the circumstances surrounding the persons engaged in it are competent to go to the jury to enable them to assign the proper and just effect of admissions made in the course of the conver-

sation or transaction, where, in a prosecution for adultery, it appeared that, after accused had admitted to the county attorney that he had had sexual intercourse with prosecutrix, he manifested a willingness to plead guilty to fornication and pay a fine, and, on being informed that the judge and district attorney had to be parties to such an arrangement, accepted the proffered assistance of the county attorney to interview the judge and ascertain his views, what the county attorney told accused as the result of the interview was competent as a part of the transaction. (Page 403.)

## ON APPLICATION FOR REHEARING.

13. INDICTMENT AND INFORMATION—ISSUES, PROOF, AND VARIANCE—TIME OF OFFENSE. Where time is not an essential ingredient of the offense, the state need not prove the offense and the transaction out of which it arose at or about the particular time stated in the information, but may prove them at any other and prior time within the statutory period of limitations. (Page 428.)

14. CRIMINAL LAW—TRIAL—ELECTION BETWEEN OFFENSES—INSTRUCTIONS. In a prosecution for adultery, where the state's evidence was directed only to the single transaction alleged in the information, a charge, which, after stating that the offense was alleged to have been committed on or about July 18, 1906, etc., instructed that "the exact time alleged in the information as to the commission of the crime charged need not be proved, for it is sufficiently established under the law if you believe that the unlawful act was committed within four years next prior to the filing of the information," etc., was not open to the objection that the jury could have assumed that there was evidence in the case of several or different offenses similar to that charged and that they were at liberty to convict accused of any one of them if committed within the statutory period of limitations.[2] (Page 428.)

McCARTY, J., dissenting.

APPEAL from District Court, Seventh District; *Hon. A. H. Christensen,* Judge.

Webtser Greene was convicted of adultery. He appeals.

AFFIRMED.

---

[2] State v. Hilberg, 22 Utah, 27, 61 Pac. 215.

*James W. Cherry* and *Thurman, Wedgwood & Irvine* for appellant.

*A. R. Barnes,* Attorney-General, for the State.

STRAUP, C. J.

The defendant was convicted of the crime of adultery. It was alleged in the information that he, a married man, committed the crime with Madge Morey, an unmarried woman, in Sanpete County, on July 18, 1906. Evidence was introduced by the state tending to show that the defendant in 1906, and for more than ten years prior thereto, resided at Mt. Pleasant, Sanpete County, and that Madge Morey in July, 1906, and for about a year prior thereto, also resided at that place, and that she during that time lived with the defendant and his family. Considerable evidence was had tending to show that the defendant was reputed to be a married man; that his wife's name was Grace Greene, and that they had lived together at Mt. Pleasant as husband and wife for more than ten years; and that Madge Morey, about twenty years of age, was reputed to be an unmarried woman. An affidavit made by the defendant in October, 1903, in a certain cause, was also introduced in evidence in which the defendant deposed that he "is and has been for ten years last past a married man, and is required to and does support Grace Greene, his wife, who resides with him at Mt. Pleasant, Sanpete County, Utah." A warranty deed executed by the defendant and Grace D. Greene in April, 1906, was also introduced in evidence, in which it was recited that "Webster Greene and Grace D. Greene, his wife, grantors, of Mt. Pleasant, Sanpete County," conveyed and warranted certain real estate therein described. In the acknowledgment of that instrument it was also recited that "Webster Greene and Grace D. Greene, husband and wife, the signers of the above instrument," duly acknowledged its execution. About the 31st day of December, 1906, Madge Morey left Mt. Pleasant and went to the Florence Crittenden Home, in Los Angeles, Califor-

nia, "a home for betrayed girls, a maternity home," and remained there until the 15th day of August, 1907. There she gave birth to a child on the 18th day of April, 1907. While she was at the home the defendant, from Mt. Pleasant, wrote several letters to her, in one of which he sent her money and cautioned her not to "mention receiving any money" and requested her to put a mark on one of the corners of the letter to be written by her, and stated, "I will know what it means." He signed the letter "Uncle." In another letter written to her while she was at the Crittenden Home, in which he also referred to himself as "uncle," he stated: "Dear Madge: Please do not think because your uncle has not written you that he has forgotten you or blames you in any way at all for anything that has transpired, for such is not the case. He has the deepest feelings of sympathy for you and wishes to do all possible he can for you, but to avoid any serious complications he has been forbidden by his attorney to do anything. He hopes you will not make a confident of Knudsen (the sheriff of Sanpete County) or Petersen (who was a witness for the state), or any one else for that matter. If any one comes to you under any pretext he hopes you will simply say to them you have nothing to say. They can't force you to say anything or to leave the state unless you desire to do so, and as soon as this matter is settled up your uncle will see that you are taken care of. He has wanted to write you often, but for fear of more trouble has been forbidden to do so, but if you stand pat he will stand by you. Burn this. Go to the country if you have a good chance, and advise your Aunt Grace where you are so you can be cared for. Your uncle has regretted many, many times that he could not write you, but will no doubt make up for it when things are settled up." In June, 1907, the sheriff and county attorney of Sanpete County called on the defendant at his place of business at Mt. Pleasant. The sheriff said to him: "I have come to arrest you, Web." The defendant said: "What for?" The sheriff replied: "The Madge Morey business," or "matter." The defendant asked: "What proof have you got?" There-

upon the sheriff produced and handed to the defendant a
writing or affidavit purporting to have been made and signed
by Madge Morey in Los Angeles, in words and figures as
follows: "Office of the District Attorney, Los Angeles
County. State of California, County of Los Angeles—ss.:
Madge Morey, of Los Angeles, California, being first duly
sworn, says: That she is the mother of an infant son born
in Los Angeles, California, April 18, 1907, and that one
Webster Greene, of Mt. Pleasant, Utah, is the father of said
infant son; that she is unmarried and had sexual intercourse
with said Webster Greene at divers times and occasions at
Mt. Pleasant, Utah, between February 1, 1906, and October
1, 1906, both inclusive. Madge Morey. H. G. S. Mc-
Cartney. [Seal.]" The defendant, after taking and read-
ing the writing, dropped his head, and said: "I didn't think
Madge would do that." He was asked if his wife suspected
him "in this matter." He said: "No, I do not know how
Grace is going to take this." The county attorney told him
that under the circumstances he would be obliged to file a
complaint against him. The defendant asked him if he would
not file it before a particular justice, naming him, and said:
"I will never go to the penitentiary, boys," and asked, if he
"should wake up dead some night, would my bondsmen be
liable?" The county attorney said: "I think as long as
they could produce your body, Web, they would be all right."
The defendant then said: "I don't believe that baby is
mine." "Well," said the county attorney, "you don't deny
having sexual intercourse with Madge Morey, do you?" The
defendant said: "No, sir; I do not"—and that "there are
some things that will never be told in this transaction." The
defendant then said: "Couldn't I put up a fine and get out
of this?" The county attorney replied that in a case of that
kind the district attorney and the judge would have to be
parties to it. The defendant then was asked if he would
be willing to plead guilty to fornication, and he replied that
he would. The county attorney saw the defendant the next
morning and told him that he was very doubtful about get-
ting the defendant through on a fornication charge. The

foregoing is, in substance, all the evidence produced by the state. The defendant offered no evidence.

The defendant, on appeal, urges that the evidence is insufficient to show that he was a married man. The contention made by his counsel in this regard is that, to effect a legal marriage it is necessary "for competent persons to declare their intention in writing; to secure the written authorization of the state; to contract in the presence of witnesses; and to be declared husband and wife by a duly authorized person. The marriage relation can be created in no other way. No amount of cohabitation, holding out, admissions, declarations, or repute, in itself, can cause the marriage relation to exist. How, then, can proof of these facts even tend to prove a legal marriage?" In *State v. Moore,* 36 Utah 521, 105 Pac. 293, we held that in a prosecution of an offense where proof of the marriage of the accused is essential that fact may be proved by his admissions of the fact. We think the evidence here was sufficient to justify a finding that the defendant was a married man.

It is further urged that, since it was alleged in the information that Madge Morey was an unmarried woman, it was essential for the state to prove such fact, and that the proof that she was reputed to be a single and unmarried woman was not sufficient. We think there was sufficient evidence to show that she was unmarried.

Furthermore, we are of the opinion that the proof that the defendant was a married man, and that he was married to a woman other than Madge Morey, and the further proof that he had sexual intercourse with the latter, was sufficient to show him guilty of adultery, whether Madge Morey was a married or unmarried woman. (Section 4210, C. L. 1907.)

Complaint is also made of the ruling of the court in admitting in evidence the writing or affidavit purporting to have been signed or made by Madge Morey, and which was handed to and read by the defendant as heretofore stated. It is urged that it was improperly received upon the

ground of hearsay. Had the writing been received **4** as the written declaration of the declarant, and as primary evidence of the facts therein declared, of course, the writing would have been hearsay. But it was not received for such purpose. It was admitted for the purpose of showing what it was that was submitted to and read by the defendant, and to show the admissions made by him with respect to the statements contained in the writing. And 'to such effect was the jury instructed. The writing was received as a part of a transaction had with the defendant, and to explain and make pertinent the replies and statements which he made in respect of the statements contained in the writing. His answers could not fully be understood without showing what was said to him or shown him, the thing responded to by him. What a party himself admits to be true may reasonably be presumed to be so. The weight and value of such testimony is quite another question. That necessarily will vary according to circumstances. Had the sheriff and the county attorney orally stated to the defendant that he was the father of an infant born to Madge Morey, that she was unmarried, and that he had sexual intercourse with her at Mt. Pleasant, and had he replied that he had sexual intercourse with her, but he did not believe that the child was his child, it is very apparent that such statements so made to him, and his reply thereto, would have been admissible. That, in effect, was all that was done here. Instead of making such statements orally to the defendant, they were made in writing. By showing him the statements contained in the writing, it was, in effect, but another way of stating to him the purported claim made by Madge Morey, that the defendant had sexual intercourse with her at Mt. Pleasant, that she was an unmarried woman, and that he was the father of her child, and, in effect, asking him whether such statements were true or false. The statements naturally called for a denial if they were not true. His reply was that he had sexual intercourse with her, but did not believe he was the father of her child. Such reply was, in effect, an admission of everything contained in the writ-

ing submitted to and read by him, except that he was the father of the child. We think the writing was properly received in evidence as part of a transaction had with the defendant (*Slatterie v. Pooley,* 6 M. & W. 664; *Jacob v. Lindsay,* King's Bench, 1 East, 460), and hence was not open to the objection that it was hearsay.

It is also urged that outside of the "alleged confession" there is no proof of the *corpus delicti.* The statements made by the defendant were in the nature of admissions, not a confession. Furthermore, the *corpus delicti* was sufficiently shown by the proof that Madge Morey, an unmarried woman, gave birth to a child. There was sufficient evidence to show, independently of the admissions of the defendant, that she was an unmarried woman, and that she gave birth to a child. The defendant's admission that he had sexual intercourse with her was sufficient to connect him with the offense.

Complaint is also made of the rulings of the court in admitting in evidence the testimony of a witness taken at a former trial of this cause and certified to by the official court stenographer to be correct. It is not contended that it was not sufficiently made to appear that the witness at the time of this trial was beyond the jurisdiction of the court. In fact, it is conceded that there was sufficient competent evidence to show such fact, but it is urged that error was committed in admitting certain other evidence offered to prove such fact. The question of the admissibility of the testimony was for the court, not for the jury; and, since there is sufficient competent evidence to show that the witness was beyond the jurisdiction of the court, the question whether other evidence bearing upon such fact was properly or improperly received is wholly immaterial.

In this connection it is also urged that section 5013, C. L. 1907, authorizing the admission of such testimony, is in conflict with section 12, art. 1, of the Constitution of this state, giving the accused the right to be confronted by witnesses against him. Section 5013 reads: "When-

ever, in any court of record, the testimony of any wit-
ness in any criminal case shall be stenographically          7
reported by an official court stenographer, and there-
after such witness shall die, or be beyond the jurisdiction of
the court in which the cause is pending, either party to the
record may read in evidence the testimony of said witness,
when duly certified by the stenographer to be correct, in any
subsequent trial of or proceeding had in the same cause,
subject only to the same objection that might be made if
said witness were upon the stand testifying in open court."
That such statutory provisions are not in conflict with con-
stitutional provisions referred to is no longer an open ques-
tion.   They many times, and in many jurisdictions, includ-
ing this, have been held constitutional.

It is further contended that proof of the venue is wanting.
It is said that, even though the evidence be deemed suffi-
cient to show that the defendant had carnal knowledge of
the body of Madge Morey, there is not sufficient evi-
dence to show that such act was committed in the          8, 9
County of Sanpete.   The venue may be inferred from
circumstantial evidence as well as proved by direct evidence.
It is rare when the commission of such acts can be shown
by direct evidence.   They are usually committed covertly,
not openly.   It was shown that the defendant during the
year, 1906, and prior thereto, resided at Mt. Pleasant, San-
pete County, and that Madge Morey during that year lived
at his house, until in December, when she left Mt. Pleasant
and went to the Crittenden Home in Los Angeles.   She
then was between five and six months in pregnancy.   Neither
she nor the defendant was absent from the county during the
month of July, 1906, except, as testified to by a witness,
that she might have been absent a few days.   The defendant
admitted that he had sexual intercourse with her.   It is not
made to appear that such act could have been committed at
any other place except at Mt. Pleasant, in Sanpete County,
Utah.   Furthermore, the writing handed to and read by the
defendant contained the direct and positive statement that
he and Madge Morey on divers occasions between February

1, and October 1, 1906, had sexual intercourse with each other at Mt. Pleasant, Utah, and that the defendant was the father of her child born on the 18th day of April, 1907. When confronted by such statement, the only fact therein denied by the defendant, and that but vaguely, was the paternity of the child, by stating that "I don't believe that baby is mine." He, however, expressly admitted that he had sexual intercourse with Madge Morey. Now, there may be instances when one's admission is to be regarded no broader than the words employed or the language used by him. But here the defendant was confronted with a positive and direct charge of having had carnal knowledge of the body of a particular female and at a particular designated place. When no reply is made to a statement made to one, or in his presence and hearing, that he was concerned in the commission of a crime, the natural inference is that the imputation is well founded, or he would have repelled it; for what is said to a man before his face he is in some degree called on to contradict it if he does not acquiesce in it. When, therefore, upon being confronted with such statement, and after having read it, he then said, "I didn't think Madge would do that" (for in his letter written to her he had cautioned her not to say anything to any one and to "stand pat" and informed her that she could not be compelled to say anything or to leave the state of California), and vaguely denied the paternity of the child, and expressly admitted having had sexual intercourse with Madge Morey, it is but reasonable to infer that such intercourse so admitted by him referred to the intercourse or intercourses of which he was then charged or accused. It cannot fairly be inferred that, when he made the admissions, he had in mind that he had had carnal knowledge of her body at Salt Lake City, or in Chicago, or at some place other than as so charged. The only inference is that he had in mind that he had carnal knowledge of her body at Mt. Pleasant, Utah, as charged. Nor from what is made to appear can it be presumed that only the fact of his having had sexual intercourse with Madge Morey was thought by him to be essential, and that the place was unessential or

immaterial, and for that reason responded to the one and not to the other, or had only the one and not the other in mind. We therefore think that, when the defendant under all the circumstances as disclosed expressly admitted that he had had sexual intercourse with Madge Morey, it is but a reasonable inference that he referred to the sexual intercourse or intercourses had with her at Mt. Pleasant and of which he was then accused and charged, and to which his attention was directed, and concerning which his reply was made. We think the evidence sufficient to show the venue in Sanpete County.

It is argued that the county attorney to whom the defendant admitted that he had had sexual intercourse with Madge Morey was not a competent witness. This contention is based on the facts that the county attorney was of counsel in the case on behalf of the state and participated in the trial thereof after his term of office had expired. When viewed from the standpoint of ethics, it may be that it is of doubtful propriety for an attorney participating in the trial of a case to become a witness except with respect to matters which are merely formal. But under the statute of this state he nevertheless is a competent witness. (Sections 3412, 3413, C. L. 1907; *McLaren v. Gillispie,* 19 Utah 137, 56 Pac. 680.) By section 3412 it is provided that "all persons, without exception, otherwise than is specified in the next two sections, who, having organs of sense, can perceive, and, perceiving, can make known their perceptions to others, may be witnesses." The persons specified in section 3413 who cannot be witnesses are those of unsound mind, children under ten years of age, and parties to transactions with deceased or insane persons. The witness was neither of unsound mind, nor a child under ten years of age; nor did he testify in respect of any transaction had with a deceased or insane person. Section 3414 pertains only to privileged communications, and among other things provides that an attorney cannot without the consent of his client be examined as to any communication made by the client to him or his advice given therein in the course

of professional employment. It is not contended that the
relation of attorney and client existed between the witness
and the defendant, or that the communication made by the
defendant to the witness was otherwise privileged. To ren-
der the witness an incompetent witness, it was necessary to
bring him within one or the other of sections 3413 or 3414.
He does not fall within either. No objection was made to
the county attorney's appearance in the trial of the case
as counsel in behalf of the state, nor to his participation
as such in the trial; nor is there any assignment or com-
plaint made with respect to such matters. The objection
made in the court below in such particular was, and the
only assignment and complaint here made with respect
thereto are, that the county attorney was not a competent
witness because he was of counsel in the case and as such
participated in the trial. The ruling on that objection and
the assignment and complaint based upon it is the only
question with respect to that controversy which is presented
for review. A discussion of any other question relating to
it is but didactic.

It is further argued that the testimony of the county
attorney and the sheriff in respect of the defendant's admis-
sions was not competent upon the ground that the admissions
were in the nature of involuntary confessions. Whether
what was said by the defendant to the county attorney and
the sheriff be regarded as admissions or confessions,
nevertheless, we think it is clearly made to appear that
the statements made by him were wholly voluntary.
It is argued that they were involuntary because a hope was
held out to the defendant that the charged offense of adultery,
which is a felony, might be reduced to that of fornication,
which, under our statute, is but a misdemeanor. The ad-
missions or statements of the defendant were not induced
or influenced, or brought about, by any such suggestion or
hope. When the county attorney and sheriff visited the de-
fendant and informed him that they had come to arrest
him, the defendant inquired "What for?" They informed

him that it pertained to the Madge Morey "matter" or "busi-
ness." He asked what proof they had. They then pro-
duced and handed him the purported affidavit of Madge
Morey. After he had read it, and after he had vaguely
denied the paternity of the child, expressly admitted that.
he had carnal knowledge of the body of Madge Morey, stated
that his wife did not suspect him, and that he did not know
how she would take it, and after he had been informed by
the sheriff that a complaint would be filed against him charg-
ing him with adultery, the defendant then inquired of the
county attorney and sheriff if he could not "pay a fine and
get out of this." The sheriff told him that he could not.
The county attorney said that he knew of a case where that
had been done, but also informed him that the judge and
district attorney would have to be parties to such an ar-
rangement. The defendant then stated that the judge "had
it in for him and might be vindictive rather than to do
him any favors." The county attorney then said that he
would speak to the judge, "and see what he says about it
and how he feels." Thereafter, with the knowledge and con-
sent of the defendant, the county attorney spoke to the judge,
and, when the county attorney met the defendant, the latter
asked him what had been done "and how he [the judge]
felt." The witness replied that the judge did not "seem to
feel vindictive," that he thought he would be as fair as he
could be under the circumstances, but that the county at-
torney "was very doubtful about getting the matter through
on a fornication charge." It thus clearly is made to appear
that the conversations and transactions relating to the ques-
tion of whether the offense could be reduced to fornication
were had after the defendant had made his admissions. This
is therefore not a case where the admissions or confession
were the result of promises or inducements, but one where
the accused, after having freely and voluntarily made his
admissions, importuned the county attorney and the sher-
iff to help him out of his difficulty. Whether the defend-
ant so importuned them, or whether they themselves first
suggested that the offense of adultery might be reduced to

fornication if the judge and district attorney consented, is not the material thing. The material thing, and which is clearly shown by the record, is that no such suggestion was made, and that no question arose with respect to the defendant's plea to fornication, or as to whether the offense might be reduced from adultery to fornication until after the defendant had admitted that he had had sexual intercourse with Madge Morey and had made the admissions referred to.

It is also argued that the conversation between the judge and the county attorney was not competent evidence. That conversation was not put in evidence. No such proof was offered. What was put in evidence was the conversation between the defendant and the county attorney in respect of the latter's interview with the judge. Standing by itself, such fact has no relevancy. But here it was a part of a transaction in which the defendant, after his admissions, manifested a willingness to plead guilty to fornication and pay a fine, and, being informed that the judge and district attorney "had to be parties to such an arrangement," the defendant accepted the proffered assistance of the county attorney to interview the judge and ascertain "how he felt about it." So that what the county attorney told the defendant in respect of the result of the former's interview with the judge was but a part of a transaction with which the defendant was himself connected, and in which he endeavored to have the charge of adultery reduced to that of fornication, not on any theory that he was innocent of the former and guilty of the latter charge, but for the sole purpose of lessening the punishment of the crime which he himself had theretofore admitted had been committed by him. It is not contended that the defendant's conduct in, and his connection with the transaction in which he sought thus to have the punishment mitigated, were not relevant. All the evidence of that transaction was admitted without objection, except what the county attorney told the defendant with respect to the result of the former's interview with the judge. Such transaction of which such conversation between the county attorney and the defendant was

a part was itself relevant and admissible. For the effort made, or the willingness shown, by the defendant, after he had admitted that he had had carnal knowledge of the body of Madge Morey, and that Grace Greene, a woman other than Madge Morey, was his wife, to have the charge of adultery reduced to that of fornication, and to be permitted to escape by the payment of a fine, was not consistent with innocence but with guilt. And it is a familiar rule that, where a part of a conversation or transaction relative to a subject under judicial investigation is admissible, all that forms a part of that conversation or transaction, together with the circumstances surrounding the persons engaged in it, are competent to go to the jury for the purpose of enabling them to assign the proper and just effect of the admission or admissions made in the course of the conversation or transaction.

Other questions are also raised and discussed by counsel, but we think they are without merit.

We are of the opinion that the judgment of the court below ought to be affirmed. Such is the order.

FRICK, J., concurs.

McCARTY, J. (dissenting).

I cannot concur in the foregoing opinion. The grounds upon which I dissent, briefly stated, are: (1) That the court erred in admitting the testimony of the witness Larsen respecting a conversation he claimed to have had with Judge Erickson in regard to the case; (2) that the court erred in admitting in evidence the State's Exhibit 3, purporting to be an affidavit of Madge Morey; (3) that the testimony respecting certain admissions made by defendant to the witnesses Knudsen and Larsen should have been excluded because the record shows that they were obtained from the defendant by Larsen, the then county attorney of Sanpete County, leading the defendant to believe that, if he would enter a plea of guilty to a complaint soon thereafter to be filed against him before a justice of the peace, "maybe"

they "could get the crime reduced to fornication," in which case a fine or county jail sentence only could be imposed; (4) that Larsen acted in the dual capacity of a witness for the state and as special prosecutor in the case, which, in my opinion, under the peculiar facts and circumstances of the case as disclosed by the record, prevented the defendant from having a fair and impartial trial; (5) that the court in its charge misdirected the jury to the prejudice of the defendant; (6) that the court erred in refusing to give certain instructions to the jury asked for by the defendant.

I shall briefly discuss the foregoing propositions in the order stated and point out wherein I think the rulings of the court thereon were erroneous and prejudicial to the rights of the defendant.

Ordinarily this court has no difficulty in determining what the facts are in a given case, especially where, as here, the evidence is all ex parte, and there is no substantial conflict thereon. In this case, however, the court is as hopelessly divided on the question as to what the facts are as it is on the legal propositions involved. It therefore becomes necessary to quote quite extensively from the evidence as the same appears in the bill of exceptions. The sheriff, whose evidence bears the imprint of honesty, sincerity, and fairness, testified that he and Larsen went to Mt. Pleasant to see the defendant in pursuance of an arrangement had between them to "go there and trap him or surprise him into making some admission;" that, when he informed the defendant that he had come to arrest him, the defendant said "What for?" and he answered "the Madge Morey business;" that the county attorney then said, "Yes; Web, you are up against it;" that the defendant said, "What proof have you?" that in answer to this inquiry he handed the defendant the purported affidavit of Madge Morey; that the defendant read the affidavit, dropped his head, and remarked, "I didn't think Madge would do that," and further stated, "I don't think that child is mine." At some time during the conversation Larsen said to the defendant, "You don't deny having sexual intercourse with Madge Morey, do you?" and the de-

fendant answered, "No, sir; I don't." Knudsen testified that, according to his "best recollection," this statement was made by defendant before there was any talk about reducing the charge to fornication, but that he was not positive whether it was before or after. Some parts of Larsen's testimony tended to show that the admission referred to was made before there was anything said to the defendant about his pleading guilty to the crime of fornication. After Larsen had given his testimony in chief and had been cross-examined by counsel for defendant, he was further examined by one of the jurors. To one of the questions asked by the juror, Larsen answered as follows: "There was probably fifteen or twenty minutes elapsed before he (referring to defendant) made any admissions at all, and they were a considerable length of time after he had read the affidavit and considerable talk."

From the foregoing it would seem that there is at least some uncertainty in the evidence respecting the exact time or stage of the conversation when the defendant made the statement that he did not deny "having sexual intercourse with Madge Morey." It may, or it may not, have been before the defendant, according to Knudsen's testimony, said, "What do you want me to do?" and Larsen answered, "I think you had better plead guilty," and stated that it was possible or "that he could get it cut down to a minor offense."

Adverting to the facts about which there is no controversy, Larsen said to the defendant on the occasion referred to, "Does your wife know anything about this, Web?" and the defendant answered, "No; she doesn't. She doesn't suspect anything." The sheriff, quoting him literally, testified: "We talked about the offense being reduced. Mr. Larsen said, 'We might reduce the offense to fornication,' and Mr. Greene said that he would like to have that done, if it could be done—pay a fine in place of going to prison." On cross-examination the sheriff testified, in part, as follows: "Q. Now, at some time, Mr. Knudsen, during that conversation you or Mr. Larsen did offer to Mr. Greene a

reward or mitigation, or held out hope of mitigation of punishment if he would plead guilty, or if he would make admissions at some time. A. Mr. Larsen did; yes, sir." Continuing, the witness said: "Well, there is a question whether Mr. Larsen held it out. Mr. Larsen said that it could be done. He didn't say that it would be. Q. He said he had better plead guilty, did he not? A. Yes, sir. I think that was said; yes, sir. . . . Q. Well, let's see. Here is your answer before (referring to the testimony of the witness given at the former trial of the case): 'I don't think that he said that immediately after. I recollect, since you speak of it, that he did ask that question, "What do you want me to do?" I think that was afterwards, and I think that was the reply that Mr. Larsen said, 'I think you had better plead guilty," and then he went on to say it was possible, or that he could. . . . get it cut down to a minor offense.' That was what was said there, was it not, in substance? A. I think so; yes, sir." On this point Larsen testified as follows: "He (defendant) says, 'Couldn't I pay a fine and get out of this?' I says, 'I don't know about that, Web. . . . If that were done in a case of this kind, the judge and district attorney would have to be parties to it.' I says, 'Would you be willing to plead guilty to fornication?' He says, 'Yes; I would.' The next morning I saw the defendant." Then the following question was put by counsel: "Anything said by Greene at that time further in relation to the matter?" The witness answered: "Well, he wanted to know what conversation I had with Judge Erickson, or what had been done and how he felt, and I told Web that the judge didn't seem to feel vindictive; that I thought he would be as fair as he could be under the circumstances, but I was very doubtful about getting the matter through on a fornication charge."

The defendant moved to strike out the last answer on the ground that it was immaterial and incompetent. The court denied the motion, to which ruling the defendant duly excepted. I think this ruling was error. The testimony of Larsen respecting his conversation with Judge Erickson, the

then district judge of Sanpete County, did not prove, nor tend to prove, any issue in the case. It was nothing more than a statement of the county attorney under oath to the jury of his opinion as to what the attitude of Judge Erickson would be towards the defendant at the trial, and was therefore immaterial and incompetent for any purpose. That the admission of this testimony was prejudicial to the rights of the defendant is, in my opinion, too plain to admit of serious discussion. The statement of Larsen that the judge *would be as fair as he could be under the circumstances* would naturally tend to create in the minds of the jury the impression that the facts and circumstances of the case were of so aggravated and unusual a character, and showed such depravity on the part of the defendant, that it would be difficult for the judge to be fair and impartial in his rulings on the trial of the case.

The Chief Justice, referring to this assignment of error in the prevailing opinion, says: "It is also argued that the conversation between the judge and the county attorney was not competent evidence. No such proof was offered." No claim was made, as I read the record, that the conversation between the county attorney and the district judge was put in evidence. What appellant complains of is that Larsen was permitted, over timely objections made by appellant, to give his version of the conversation he had with Judge Erickson. It is further said in the prevailing opinion that "it was a part of a transaction in which the defendant after his admissions manifested a willingness to plead guilty to fornication and pay a fine, and, being informed that the judge and district attorney had to be parties to such an arrangement, the defendant accepted the proffered assistance of the county attorney to interview the judge and ascertain how he felt about it." And again it is said in the opinion written by the Chief Justice: "This is therefore not a case where the admissions or confession were the result of promises or inducements, but one where the accused after having freely and voluntarily made his admissions importuned the county attorney and the sheriff to help him out of

his difficulty." I fail to find anything in the record that will justify or support any such conclusions. Larsen is the only witness who testified to what was said in reference to his seeking an interview with Judge Erickson, and his testimony on that point was as follows, omitting repetitions: "He (referring to defendant) says, 'Couldn't I pay a fine and get out of this?' I says, 'I don't know about that, Web.' I says, 'If that were done in a case of this kind, the judge and the district attorney would have to be parties to it.' I said, 'I know of a case where it has been done.' . . . I says, 'I will tell you what I will do, Web. I will speak to Judge Erickson and see what he thinks about it, how he feels about it.' 'Well,' he says, 'I wouldn't expect anything from Judge Erickson.' . . . And told me that he thought Judge Erickson might be somewhat vindictive rather than to do him any favors. 'Well,' I says, '. . . it is the only way it could be done. . . .' And I asked Web, I says, 'Would you be willing to plead guilty to fornication?' He says, 'Yes, I would.' 'Well,' I says, 'I will speak to the judge about it, . . . and mention it to Fred Woods.' I says, 'I don't know what view they will take of it.' And he seemed to think that he couldn't expect anything of Judge Erickson, and told me so." The foregoing is all that the record contains of what was said with reference to Larsen seeing and talking with Judge Erickson about the case. There is not a scintilla of evidence, as I read the record, that tends to show that the defendant "importuned" these officers "to help him out of his difficulty," or that he "accepted the proffered assistance of the county attorney to interview the judge." Practically all that was said upon that occasion about Larsen seeing the judge was said by Larsen himself. And I think the evidence conclusively shows that what he did in the premises was of his own volition, and not in pursuance of any request made of him by the defendant. True, when Larsen signified his intention of interviewing the judge about the case, the defendant did not enter a direct and emphatic protest against him doing so. But what he did say was more in

the nature of a disapproval than it was of an acquiescence on his part of what Larsen proposed to do in the matter. And what Larsen said to the defendant on the following day about his talk with the judge was no more a part of the first conversation than it would have been had Larsen met the defendant six months later, and told him of some conversation he might have had with the judge about his case. It was rather a part of the scheme which Larsen had formulated before he went to Mt. Pleasant to "trap" the defendant into making admissions of an incriminatory character to be used against him in case he should be brought to trial on a charge of adultery. And it is apparent that what Larsen said about seeing and talking with the judge was a part of the scheme to induce the defendant to make admissions, and not because of any solicitude that Larsen had for the defendant, as the prevailing opinion seems to indicate.

The next assignment of error involves the admissibilty in evidence of the purported affidavit of Madge Morey. The court instructed the jury that the affidavit "was admitted for the sole purpose of rendering intelligible the conversation testified to as occurring between the defendant and the witnesses Knudsen and Larsen, and for no other purpose whatever, and it is to be considered by you for no other purpose whatever. It is not proof in itself that Madge Morey had sexual intercourse with the defendant at Mt. Pleasant, or at any other place in Sanpete County, on or about the 18th day of July, 1906, or at any time whatever or at all or at any place. It is not evidence in the case for any purpose whatever, and does not prove or tend to prove in the remotest degree any fact in this case material or otherwise. It is of no weight whatever as proving or tending to prove the alleged fact therein stated." It is contended on behalf of the state, first, that the affidavit, under the circumstances as testified to by the witnesses, became a part of the conversation which was had between the defendant and the witnesses Knudsen and Larsen, and that "it really becomes a part of the admission" made by the defendant; and, second, that the

court having, by giving the foregoing instruction, restricted the consideration of the affidavit by the jury for the purpose only of "rendering intelligible" the conversation between the defendant and the witnesses mentioned, it could not have prejudiced the rights of the defendant. In answer to the first proposition, it is sufficient to say that the evidence (as I read the record) does not show that defendant admitted the purported affidavit, or any part of it, to be true. On reading the so-called affidavit, the defendant said, "I didn't think Madge would do that." This remark was more consistent with the theory of the defendant's innocence than it was with the theory of his guilt because an innocent man would naturally be surprised should a charge of this kind be made against him, and he might well exclaim that he "didn't think" the party making the accusation would do such a thing. And the further remark made by the defendant that he did not think that the child was his was more in the nature of a denial than an admission of the truth of the contents of the affidavit. It is evident that Larsen so construed the remark, because in answer to it he made the following statement to the defendant, which was in the nature of a general inquiry, namely: "Well, you don't deny having sexual intercourse with Madge Morey, do you?" And the defendant answered, "No, sir; I don't." This answer, technically and literally construed, was neither an admission nor a denial. Suppose, for illustration, the defendant in answer to Larsen had said, "No, sir; I don't, nor do I admit it," or had said, "I do not deny it; I do not admit it." No one would seriously contend that either of the answers suggested would be an admission or a denial. All that could be claimed for such an answer would be that the party making it was noncommittal regarding the matter about which he was interrogated. Assuming, however, for the sake of argument, that the defendant's answer, associated as it was with the balance of the conversation carried on between him and the officers, amounted to an admission that he had had sexual intercourse with Madge Morey, yet I am clearly of the opinion that it was not an admission of the truth of the

recitals contained in the so-called affidavit. The most that can be claimed for the answer is that it was an admission by the defendant that he at some time and place had had carnal knowledge of the body of Madge Morey. He did not say nor did he admit that these unlawful relations took place in Sanpete County, or, for that matter, within the state of Utah. When the affidavit was handed to the defendant, he and the officers were talking about Madge Morey. The defendant examined the paper, and said, "I didn't think that Madge would do that," and further remarked, "I don't think that child is mine." As I have stated, Larsen evidently did not construe these statements, or either of them, as an admission of the truth of anything contained in the paper, because, instead of asking the defendant the direct question if he admitted the contents of the document to be true, or if he had sexual intercourse with Madge Morey as charged in the affidavit, he asked him the general question namely, "You don't deny having sexual intercourse with Madge Morey, do you?" That is, Larsen resumed the conversation at the point where it had been interrupted by the handing of the affidavit to the defendant, and asked the defendant the question referred to without any reference to the specific acts recited in the affidavit. In the prevailing opinion it is said: "Here (referring to the affidavit) the defendant was confronted with a positive direct charge of having had carnal knowledge of the body of a particular woman at a particular designated place." And it is further said: "When no reply is made to a statement made to one or in his presence and hearing that he was concerned in the commission of a crime, the inference is that the imputation is well founded, or he would have repelled it." But in this case, unless the purported affidavit in question is at least to some extent, treated as substantive evidence, there is no legal proof that the defendant was charged with the commission of a crime. The affidavit in a legal sense was nothing more than a piece of waste or scrap paper without any known author, because there is not a scintilla of legal evidence in

the record that Madge Morey, the purported author, ever saw the document. The defendant was no more called upon to reply to the recitals of the paper when it was handed to him by the officers than he would have been if a stranger had picked it up in the street and handed it to him. Giving the evidence referred to the most liberal construction of which it is susceptible, I think it fails to show an admission on the part of the defendant that he and Madge Morey committed any of the specific acts mentioned in the affidavit.

In regard to the other ground upon which it is claimed the affidavit was admissible, it might be well to observe that neither the district attorney, when he offered the affidavit in evidence, nor the Attorney General in his oral or printed argument to this court, pointed out or attempted to point out wherein or in what respect the affidavit was necessary to "render intelligible" the conversation, or any part of it. A mere inspection of the record will show that the conversation, so far as it is material to any issue in this case, is just as intelligible when considered separate and apart from the affidavit as it is when considered in connection therewith. The contents of the affidavit were the purported statements of Madge Morey made out of court, and not in the presence or hearing of defendant. Moreover, as I have stated, there is not a scintilla of legal proof that Madge Morey ever saw the purported affidavit. As stated by counsel for appellant in their printed brief, the affidavit was the "rankest kind of hearsay" evidence, and was inadmissible for any purpose.

In the case of *Preston v. Bowers,* 13 Ohio St. 1, 82 Am. Dec. 430, practically the same question was involved, and the court, in the course of the opinion, said:

"The plaintiff had a right to give the declaration of his wife in evidence to show the state of her affections toward him recently before the alleged seduction. But the exercise of a right and the abuse of a right are two different things. The words and acts of the defendant, Griffin, reported by the wife to the husband, and detailed by him in evidence to the jury, were nothing but hearsay, and in themselves clearly inadmissible. It is

said in argument, however, that the declarations of the wife in regard to the state of her affections toward the plaintiff were so blended with her report of the acts and declarations of Griffin as to render the separation of them impracticable. We do not think so. It seems to us there would have been no practical difficulty in a statement of those declarations of his wife which tended to express attachment to him, and at the same time withholding her report of the words and acts of Griffin. And we cannot avoid the conviction that, while the plaintiff was claiming to give in evidence the declarations of his wife for a legitimate purpose, his real and primary object was to bring before the jury her statement of the words and acts of Griffin. In permitting this to be done, we are of the opinion the court below erred."

Likewise in the case of *Sims v. Moore*, 61 Iowa, 130, 16 N. W. 59, it is said:

"It is true as a general rule that, where it is sought to prove admissions made by a party to an action, it is competent to prove the whole conversation in which it is claimed the admissions were made; and this may oftentimes consist, in part at least, of a repetition of a communication between the witness and a third person. But this record does not disclose any such purpose. The only effect of the evidence objected to was to allow the witness to detail the opinion of Dr. Green to the jury under guise of a conversation with the defendant. Whether intentionally done or not, the opinion of Dr. Green as to the character of the injury was thus allowed to be given to the jury, and because this opinion was first made known to the defendant does not divest it of its character as hearsay evidence. We think it should have been excluded."

The affidavit in this case contained a direct statement purporting to have been made by Madge Morey that she was unmarried; that she had had sexual intercourse with the defendant at divers times, within which was the date alleged in the information, at Sanpete County, Utah; that she had given birth to a child; and that the defendant was its father. Every material fact necessary to make out a case of adultery against the defendant is recited in the affidavit. Therefore its admission in evidence could not have been otherwise than

prejudicial to the defendant. Moreover, without the affidavit, the evidence is insufficient to support the judgment of conviction in the case. Before the defendant could be legally convicted, it was necessary for the state to satisfy the jury beyond a reasonable doubt by competent evidence that the defendant not only committed the crime of adultery with Madge Morey, but that the crime was committed on or about July 18, 1906, at Sanpete County, Utah. Though it be conceded that the evidence shows the defendant admitted having had sexual intercourse with Madge Morey, yet it falls far short of showing that the particular act of adultery charged in the information took place in Sanpete County. In fact, there is not a scintilla of evidence tending to show that the defendant was in Sanpete County, or even in the State of Utah, during the month of July. And, furthermore, while the evidence shows that Madge Morey's residence during the summer of 1906 was at Mt. Pleasant, Sanpete County, Utah, and that she was in the employ of one Abram Johnson, yet it fails to show that she was in Sanpete County on or about July 18, 1906, the date on which it is alleged in the information the crime was committed. The only evidence in the record on this point other than that she was a resident of Mt. Pleasant during the summer of 1906 is that given by Abram Johnson, her employer. He testified, so far as material here, as follows: "Madge Morey worked for me during the summer of 1906 in my store. . . . I cannot say Madge Morey was in Mt. Pleasant all the month of July. I think she was working for me during the month, some part of it. I am not positive. . . . I don't know whether the girl went away and took her vacation from the store in 1906 during the month of July. I can only give my opinion. I believe she went away during that period for a short time. Went out of Mt. Pleasant and out of this county. I have a pretty strong opinion she went away for a few days. I think it was in July some time. . . . At the time she took her vacation she was working for me. During the time she worked at the store she took a few days off. I don't know when it was, but it is my opinion that it was

in July, 1906." While this evidence does not show that Madge Morey was out of Sanpete County at the time it is alleged the crime was committed, it certainly falls far short of showing that she was in Sanpete County on or about that particular date. As stated, the foregoing is the only testimony in the record respecting the whereabouts of Madge Morey during the month of July, 1906, and it certainly tends to show that she was out of Sanpete County at least a part of that month. Therefore the record not only fails to show that the defendant was in Sanpete County at the time the crime is alleged to have been committed, but fails to show that his accomplice was there on or about that date.

The testimony respecting the alleged incriminating statements of defendant to the effect that he would be willing to plead guilty to a charge of fornication should have been excluded. The record I think clearly shows that the defendant made these statements under the belief induced by the hope held out to him by the county attorney that he would be permitted to plead guilty to a charge of fornication, and that a fine or county jail sentence only would be imposed. That there was such an understanding between him and the county attorney is conclusively shown by the testimony of Knudsen and the conduct of the county attorney in going immediately thereafter to Judge Erickson and consulting him about the matter and reporting to the defendant the following day that he "was very doubtful about getting the matter through on a fornication charge." This feature of the case, I think, falls clearly within the well-recognized rule of evidence which holds that a confession obtained by an officer from a person accused of crime through the influence of hope or fear cannot be received in evidence.

The record shows that the witness Larsen, in his capacity as county attorney, went to Mt. Pleasant with Knudsen, the sheriff, to get admissions from the defendant respecting his alleged unlawful relations with Madge Morey; that at the time the case was tried Larsen was not county attorney; that on motion of the district attorney he was entered as attorney of record to assist in the prosecution of the case; that he was

not employed by anybody, nor was he requested by the court, to act as a special prosecutor in the case; that he received no compensation for his services, and that there was no legal obligation on his part to assist in the prosecution of the case; that he examined and selected the jurors who were to hear and weigh his testimony knowing that he would be called as a witness for the state; that he peremptorily challenged three jurors off the panel. He also examined some of the witnesses, and otherwise took an active part as an attorney in the case. Defendant strenuously insists that, because Larsen was permitted to unite the functions of prosecuting attorney and witness, he was not accorded a fair and impartial trial. In fairness to the trial court, I here state that the record shows that the oath was administered to each witness as he was called to the stand to testify, and that Larsen was the last witness called. And, so far as the record discloses, neither the court nor the defendant was advised at the time Larsen was entered of record as associate counsel for the state that he would later on be called as a witness. Therefore the first opportunity the defendant had to object to this kind of procedure was when Larsen was called and sworn as a witness. The court no doubt would, if it had been advised of the situation, have refused to permit Larsen to appear in the cae as special counsel. The court at the time the objection was made was confronted with this situation: Larsen, under the statutes of this state, was a competent witness, notwithstanding he had been entered of record as special prosecutor, and had taken and was then taking an active part in the prosecution of the case. And, the jury having been impaneled and sworn, the court could not legally stop the proceedings and order a new trial. Therefore the only logical course for the court to take under the circumstances was to proceed with the trial of the case and rectify whatever error had been committed prejudicial to the rights of the defendant by the granting of a new trial. The question is not, as the Attorney General seems to think, whether a prosecuting attorney is a competent witness in a case which he is

38 Utah—27

conducting. Nor does the appeal involve the question of
whether or not the court may permit private counsel to assist
the prosecuting attorney in the trial of criminal cases. Nor
is it a case where some unforseen emergency arose during
the trial which made it imperative for the prosecuting attor-
ney, or his associate counsel, to become a witness and testify
in order to prevent a miscarriage of justice. The question
here involved is, May an attorney at law, who is an impor-
tant witness for the state in a criminal case, assist the prose-
cuting attorney, examine and select the jurors who are to
hear and weigh his testimony, and otherwise take an ac-
tive part in the trial of the case? While there are decisions
of courts of high standing in which the practice of an at-
torney acting in the double capacity of attorney and witness
is strongly condemned, I have been unable to find a case
which decides the question here raised. Some of the courts
in condemning the practice have said that "it is highly in-
decent, . . . that it leads to abuse, . . . and should be dis-
countenanced by court and counsel." (*Frear v. Drinker,* 8
Pa. 520; *Morgan et al v. Roberts,* 38 Ill. 65); that "it is of
doubtful professional propriety for an attorney to become
a witness for his client without first entirely withdrawing
from any further connection with the case," and that an
attorney who unites the function of attorney and witness
"places himself in an unprofessional position" (*Ross et al.
v. Demoss,* 45 Ill. 447); that "courts should extend no coun-
tenance to the practice and only tolerate it in cases of press-
ing necessity" (*Spencer v. Kinnard,* 12 Tex. 188); that
*"so reprehensible is the practice generally* that it has been
much doubted whether a lawyer is a competent witness for
his client" (*Moats v. Rymer,* 18 W. Va. 642, 41 Am. Rep.
703), (Italics mine.) In 50 Cent. Dig. section 121, col.
146, it is said: "Though, under the laws of Louisiana, an
attorney is competent for his client, his position as a witness
is one of extreme delicacy for himself and the court; and it
is always desirable for the harmony of the profession, the
independence of the bench, and public confidence in the ad-
ministration of justice that he should not testify, except in

extreme cases when all other means of proof are impossible, and then he should withdraw from the case. ([1847] *Succession of Harkins,* 2 La. Ann. 923; [1852] *Madden v. Farmer,* 7 La. Ann. 580; [1855] *Boissy v. Lacou,* 10 La. Ann. 29.)" And this court, in the case of *McLaren v. Gillispie,* 19 Utah, 137, 56 Pac. 680, said: "While we hold that the attorney was a competent witness under the statute of this state, we do not wish to be understood as commending the practice of calling an attorney engaged in the trial of a case as such to testify as a witness. This practice should not be indulged in except in cases where it is absolutely necessary. Cases may arise, however, where it is absolutely necessary that the attorney be called as a witness, but when such exigency arises, and the attorney can safely do so with respect to the interests of his client, he should invariably retire from the case."

Now, if the practice of merging the functions of attorney and witness is to be discountenanced in civil cases where property rights only are involved, the practice for a much stronger reason should be condemned in criminal cases where the defendant's life or his liberty is at stake. The only criminal case I have been able to find in which this question was in any way involved is *Wilkinson v. People,* 226 Ill. 135, 80 N. E. 699. The defendant in that case was convicted of the crime of perjury alleged to have been committed while testifying in a case in which he and several other persons were being tried for conspiracy. In the course of a well-considered opinion the court said:

"It is insisted that the judgment below should be reversed because one of the attorneys who appears as counsel for the people and argued the case orally in this court was a leading witness (not attorney) on behalf of the prosecution in the court below. In justification of his conduct it is insisted that there is no law in this state, statutory or otherwise, forbidding an attorney to be a witness and at the same time an attorney in a case. Doubtless this is true; but courts have generally condemned the practice as one which should be discountenanced and of doubtful professional propriety—(citing cases). . . . Here the witness first appeared

as an attorney for the Lake Street Elevated Railroad Company
in the personal injury case, and was prominent in procuring affidavits
in support of the motion for a new trial and one of which he at-
tempted to obtain from the defendant Wilkinson. He next ap-
peared, he says, as special counsel for the people in the prosecution
of the conspiracy case. (The alleged perjury for which the de-
fendant was convicted related to matters material to the issues
raised in the two cases referred to in the opinion.) And, while
he may not have actively appeared in the prosecution of this case
on the trial below, it is quite apparent he had more or less to do
with shaping the course of the prosecution, and voluntarily, as
we have already said, appeared as a prominent witness in the
case. . . . The fact that he does appear in this record in the un-
enviable attitude of a willing witness and zealous attorney should
not *perhaps* work a reversal of the judgment below if the record
were in all other respects free from error, but we cannot overlook
such professional impropriety when our attention is called to it."
(Italics mine.)

The case having been reversed on other points, it might
seem on first impression that the decision is an authority
against, rather than in favor of, appellant's position on this
phase of the case. It must be borne in mind, however, that
the attorney who testified against the defendant in that case,
while "he had more or less to do with shaping the course of
the prosecution," did not appear at attorney of record and
special prosecutor in the lower court, and in that capacity
take an active part in the prosecution of the case before the
jury as was done by Larsen in the case at bar. Therefore,
in view of the strong and emphatic language used by the
court in expressing its disapproval of the conduct of the
attorney in appearing in the case as a witness in the trial
court and as an attorney of record in the appellate court, I
think it is quite evident that if the attorney had also ap-
peared as special prosecutor and in that capacity selected
the jury who were to pass upon the weight of his testimony,
examined and cross-examined witnesses, and otherwise ac-
tively engaged in the prosecution of the case, the court in
all probability would have held that the defendant was
thereby prevented from having a fair and impartial trial.

While Larsen's desire to secure the conviction of the defendant whom he believed to be guilty of the crime charged in the information is to be commended, yet his conduct in blending the functions of attorney and witness ought not, under the peculiar circumstances of this case, be upheld. The state was ably represented by the district attorney, who, as shown by the record, was familiar with the facts of the case, he having represented the state in a former trial of the defendant for the same offense; hence there was neither justification nor excuse for Larsen to identify himself with the case as special prosecutor, and as such prosecutor take an active part in the trial. By so doing, instead of being an unbiased witness in the case, as he repeatedly asserted he was while testifying, he became an active and aggressive partisan against the defendant. In fact, his strong desire for the conviction of the defendant, which repeatedly manifested itself during the progress of the trial, was independent of the evidence well calculated to unduly prejudice the jury against the defendant, and thereby prevent him from having a fair and impartial trial. On one occasion, while testifying, Larsen volunteered the following statement, which was in no sense responsive to any question asked him by court or counsel: "Of course, we were satisfied that Mr. Webster Greene was guilty in our own minds when we went there," referring to their trip to Mt. Pleasant hereinbefore mentioned. This statement of the witness was, on motion of the defendant, stricken out. My only reason for referring to it is that it tends to show the intensity of Larsen's feelings towards the defendant. Under all the circumstances, the impaneling by Larsen of the jury who were to hear and weigh his testimony, and his activities generally in the trial of the case as a quasi public officer, was in my opinion prejudicial error.

Defendant requested the court, so far as material here, to instruct the jury as follows: "You are instructed that . . . the prosecution have elected to rely for a conviction

on an act of sexual intercourse committed on or about the 18th day of July, 1906, in Sanpete County, State of Utah." The court refused to so instruct the jury. I think this was error. While the district attorney did not, in so many words, announce that he intended to rely on the act of sexual intercourse alleged to have been committed on or about the 18th day of July, 1906, yet the record shows that the case was tried and was presented to the jury on the claim that the crime charged was committed on or about that date. In fact, there was only the one alleged act in the case, and that was the alleged act of July 18, 1906—the act by which the child of Madge Morey was conceived—and the court so instructed the jury. The court, among other things, instructed the jury that one of the essential and material allegations in the information which the state must prove beyond a reasonable doubt was "that the defendant, Webster Greene, on or about the 18th day of July, 1906, in Sanpete County, State of Utah, did have carnal knowledge of the body of Madge Morey, the woman named in the information." The court also charged the jury as follows: (6) You are instructed that, before you can consider any alleged confession, or admission of the defendant, you must first find from the evidence to your satisfaction beyond a reasonable doubt that on or about the 18th day of July, 1906, Madge Morey was an unmarried woman, and that on or about said date she had sexual intercourse with a male person. Proof of this fact is termed proof of the *corpus delicti.*" The court further charged the jury as follows: "(4) You are instructed that the exact time alleged in the information as to the commission of the crime charged need not be proven, for it is sufficiently established under the law, if you believe from the evidence beyond a reasonable doubt that the unlawful act charged was committed within four years next prior to the filing of the information, which information was so filed July 12, 1907." The giving of instruction No. 4 is assigned as error.

As hereinbefore stated, the state elected to rely for a conviction on the act of intercourse alleged to have been committed on or about July 18, 1906, by which the child in question was conceived. There is no evidence in the record showing, or tending to show, that Madge Morey carried this child for a longer or shorter period than nine months. In fact, there is no evidence on the subject. The evidence of Mrs. Spencer, matron of the Florence Crittenden Home, shows that the child was born on or about April 18, 1907. The presumption, therefore, is that the child was conceived on or about the 18th of July, 1906 (Wharton & Stille, Med. Jur., section 40 *et seq.;* Wharton, Crim. Ev. [9th Ed.], section 816; Jones, Ev. [2d Ed.], section 129; 16 Cyc. 871), and it is evident from the record that the state, relying on this presumption, alleged the act of intercourse constituting the crime to have taken place on that date. The information was filed July 12, 1907, nearly a year after the crime is alleged to have been committed, and nearly three months after Madge Morey gave birth to her child. The jury were therefore instructed that they had a margin of two years before the child was conceived and of over three months after it was born within which they might find that the act was committed. And, as stated by counsel for appellant in their brief, "all that the jury could logically make out of the information was that the court thought that there was . . . evidence of the commission of the offense at some other time, and here is where the vice of the admission of Exhibit 3 comes to light, for in that paper is the purported statement of Madge Morey 'that she is unmarried and had sexual intercourse with said Webster Greene at divers times and occasions at Mt. Pleasant, Utah, between February 1, 1906, and October 1, 1906, both inclusive.'" Furthermore, the instruction is in direct conflict with the instruction given by the court on the same issue.

This same question was, to some extent, involved in the case of the *State v. Hilberg,* 22 Utah 27, 61 Pac. 215, and this court, speaking through Justice Miner, in the course of the opinion, said:

"Any one of the acts selected by the prosecution before the introduction of the evidence would be as properly the act charged in the information as the other. Until the evidence of some act was given, the charge in the information was floating, uncertain, and contingent, aimed as much at one act as at another, and, in the absence of an election by the prosecution, it remained for the evidence to designate and point out the particular act intended, and upon which the prosecution would rely for a conviction. When evidence was introduced tending directly to the proof of one act, and for the purpose of securing a conviction upon it, from that moment that particular act became the act charged. No election having been made by the prosecution, the law made the election"— citing *People v. Clark*, 33 Mich. 112; *Lovell v. State*, 12 Ind. 18; *People v. Hopson*, 1 Denio (N. Y.) 574. See, also, Wharton, Crim. Ev. (9th Ed.), section 104; 2 Ency. L. & P. 298.

This phase of the case is not discussed in the prevailing opinion. Therefore I am not advised upon what theory the giving of the instruction complained of (No. 4) is upheld. The affirmance of the judgment in this case is necessarily a departure from the rule announced in the Hilberg Case.

I am of the opinion that the court erred in refusing to instruct the jury to return a verdict of not guilty as requested by the defendant. I fail to find any evidence in the record from which a legal inference can be drawn that the crime charged was committed in Sanpete County. In his discussion of this phase of the case the Attorney General, in his printed brief, says: "In the case at bar, while there is no direct proof that the crime was committed in Sanpete County any more than there was direct proof that the crime was committed, it was proved by circumstantial evidence that the crime was committed as alleged in Sanpete County. It was there that the defendant lived, it was there that Madge Morey resided at the time, and it was there that Madge Morey resided with the defendant, and it was from Sanpete County that she went direct to Los Angeles to the Home. Madge Morey was in Sanpete County during the year 1906. It was not shown that she was out of the county during the month of July." It is true that Madge Morey lived at the

home of defendant while she was in Sanpete County, and the evidence tends to show that the defendant wrote two letters to her while she was at the Florence Crittenden Home in Los Angeles, but these facts do not raise a presumption, nor are they evidence, that she had sexual intercourse with the defendant, as the Attorney General seems to conclude. While the evidence is not very conclusive that Madge Morey was out of Sanpete County in the month of July, yet what evidence there is on this point certainly tends to show that she was out of the county for at least a few days during the month. The evidence of Abram Johnson hereinbefore referred to tended to show this. The record shows that from about the 1st of June until the latter part of November, 1906, a young man who at the time was was about twenty-five years of age "kept company" with Madge Morey, and that during this time he was quite attentive to her. He frequently called to see her at her home in the evenings. He also took her out riding, and to dances and theaters. He left a hammock at her home, and he "supposed she used it." After she became an inmate of the Crittenden Home, he made several trips from Sanpete County to Los Angeles, and on each of these trips he called at the Home to see her. By referring to this, I do not wish to be understood as holding, or even as intimating, that the young man's conduct in the premises was not in every respect honorable, because there is nothing in the record to justify an inference, or for that matter even a suspicion, that his friendship for Madge Morey and his general conduct toward her either before or after she got into this trouble was not prompted by the purest of motives, yet it must be conceded that the attentions he paid her while she was in Sanpete County (and according to his own testimony these attentions covered the month of July, 1906) and his frequent calls at the Crittenden Home to see her after he was advised of her trouble furnish a much stronger basis for an inference of guilt than do the matters referred to by the Attorney General for believing that

the crime charged was committed by the defendant in Sanpete County.

I am clearly of the opinion that the evidence is insufficient to support a finding by the jury that the crime charged was committed in Sanpete County, and that the court should have so instructed the jury.

For the reasons herein stated, I am of the opinion that the case should be reversed and a new trial granted.

### On Application for Rehearing.

STRAUP, J.

It is contended that rulings made by the trial court in refusing appellant's request and in charging the jury with respect to the identity of the alleged offense are in conflict with principles announced in the case of *State v. Hilberg*, 22 Utah, 27, 61 Pac. 215. Complaint is made in a petition for a rehearing because we expressed no views on such questions. In delivering our opinion we thought, and still think, that no error was committed in such particular. We then thought, and we think, it evident from appellant's brief, that the questions upon which we did express our views were those which counsel considered the most important and upon which they chiefly relied for a reversal of the judgment. However, let us again look at these.

In the information it was charged that the appellant "on the 18th day of July, 1906, at Sanpete County, Utah, did unlawfully," etc., "commit adultery with one Madge Morey," etc., "by then and there having carnal knowledge of her body." Of course, but one adulterous act or transaction, but one offense of adultery, was charged. The state offered no evidence and made no attempt to prove several offenses of adultery or different adulterous acts or transactions committed or had by the defendant with Madge Morey. The evidence was directed to but one offense and transaction, the one alleged in the information. The defendant nevertheless requested the court to charge that "you are instructed that under the evidence in this case the prosecution *have*

*elected* to rely for a conviction on an act of sexual intercourse committed on or about the 18th day of July, 1906, in Sanpete County, Utah." What appellant's counsel themselves say in their brief is a complete answer to the alleged error refusing the proposed request. They say: "There is no legal evidence in the record that an act constituting the crime of adultery was committed at any time, but such evidence as there is refers to but a single act committed on the 18th day of July, 1906, if committed at all." If it be true that all the evidence "such as there is refers to but a single act," if any at all was committed, we cannot see wherein the question of an election is involved. The state charged but one offense. It attempted to prove but one; and that alleged in the information. Now the court, instead of charging the jury on a theory "of an election," charged them that the material allegations set forth in the information "and all of which the state must establish to your satisfaction beyond a reasonable doubt before you can find the defendant guilty are," stating among others, "that the defendant, Webster Greene, on or about the 18th day of July, 1906, in Sanpete County, State of Utah, did have carnal knowledge of the body of one Madge Morey, the woman named in the said information; that the said defendant at the time of having carnal knowledge of the body of said Madge Morey was a married man, having a lawful wife alive; and that the said Madge Morey was not then and there the wife of the said defendant, Webster Greene." The particular offense alleged and charged in the information, and none other, was therefore sufficiently characterized and identified by the charge. The court then charged "that the exact time alleged in the information as to the commission of the crime charged need not be proved, for it is sufficiently established under the law, if you believe from the evidence beyond a reasonable doubt that the unlawful act charged was committed within four years next prior to the filing of the information, which information was so filed July 12, 1907." Time not being an essential ingredient of the offense, we had assumed that the proposition stated in the foregoing charge was one so well

settled in criminal jurisprudence as not to require any dis-
cussion of it.

Where time is not an essential ingredient of the offense,
to hold that the state is required to prove the alleged
offense and the transaction out of which it arose at          **13**
or about the particular time stated in the informa-
tion, and may not prove them at any other and prior time
within the statutory period of limitations, is contrary to our
knowledge of the criminal law.

Such a charge is not open to the objection urged by coun-
sel that the jury could assume that there was evidence in the
case of several or different offenses similar to the one charged,
and that they were at liberty to convict the defend-
ant of any one of them if committed within the statu-          **14**
tory period of limitations.   As well say in a case of
larceny or murder that the jury under such a charge could
assume that there was evidence of several or different lar-
cenies or murders similar to the one charged, and that they
were at liberty to convict the defendant of any one of them
if committed by him within the statutory period of limita-
tions.

On reading this case and the Hilberg Case, it is readily
seen that they are not even analogous, but strikingly dis-
similar.   In the Hilberg Case the defendant was charged
with  an  unlawful  sexual  intercourse  with  a  female
under eighteen years of age alleged to have been committed
on the 15th day of February, 1898.   As there stated by the
court, there was but one count in which the commission of
but one act was alleged on a day specified.   Upon the trial
the state was permitted to prove by the testimony of the
female six distinct and separate acts or crimes of sexual
intercourse covering a period of about a year, the first of
which was in April, 1897, and the last in April 1898, two
months after the time alleged in the information, and to go
to the jury upon all of such separate and distinct acts or
crimes, without requiring any election to be made.   The
court held such a submission improper, that on the trial the
first offense testified to by the prosecutrix and introduced by

the state, and characterized and identified by its evidence, being the one in April, 1897, must, in law, be deemed the one elected by the state, and hence the evidence of sexual intercourses and criminal conduct and acts of the defendant and the prosecutrix subsequent to that time was improperly received.  To properly dispose of counsel's contentions in respect of the refused requests and of the charge, we need but contrast the facts in the Hilberg Case with the statement of counsel in this case that all the evidence "there is refers to but a single act committed," if committed at all.

The petition for a rehearing is denied.

FRICK, C. J., concurs.

McCARTY, J. (dissenting).

A comparison of this case with the Hilberg Case I think will show that the distinction, if any, between the two cases, is in the degree of the prejudicial effect of the errors committed, rather than in the principles of law involved; and, as I read the cases, the errors in this case are much more glaring than the errors of a corresponding character in the Hilberg Case. In order to show the similarity of the facts in the two cases and that both are governed by precisely the same principle of law, I shall, to some extent, refer to the printed record as well as the opinion in the Hilberg Case.

In the Hilberg Case the information charged that the crime was committed on the 15th day of February, 1898. At the trial the prosecutrix was permitted, over the objections of the defendant, to testify to acts of sexual intercourse with the defendant covering a period of about ten months next preceding the date mentioned in the information, and after testifying to an act of sexual intercourse which she claimed took place on or about the date alleged in the information, and as a result of which a child was born, she was permitted to testify to an act of intercourse which she claimed she had with Hilberg about a month subsequent to the date alleged in the information.  The printed abstract of the record in that case shows that a witness, Brigham Birch, testi-

fied that on the morning of April 27, 1897, Hilberg remarked
to him "about having sexual intercourse with (the prosecu-
trix). . . . He said the act occurred in the barn at Hilberg's.
. . . The defendant told me at that time and place that he
had just had sexual intercourse with her." Hilberg testified
as a witness, but did not dispute the evidence given by Birch.
The court, however, admitted the evidence of sexual inter-
course both before and after the date charged in the informa-
tion for that purpose only of showing the associations of the
parties, and in the presence of the jury so stated at the time
the evidence was received. And the court in its charge in-
structed the jury as follows: "You are instructed that all
evidence as to any acts of intercourse between the defendant
and . . . (naming the prosecutrix) other than the act men-
tioned in the information can only be considered as showing
the association of those parties, and not as proving that the
defendant committed the act charged." The court in that
case, also charged the jury that, before they could convict
the defendant, they must be satisfied from the evidence be-
yond a reasonable doubt that he committed the act charged
"on the date named (in the information) or near that date."
The record shows that the act alleged to have taken place
on or about February 15, 1898, and as a result of which the
prosecutrix gave birth to a child, is the act that the state
relied on for a conviction, and that the defendant during the
entire progress of the trial understood that this was the act
for which he was being tried.

For the purposes of illustration, I shall assume, as my
Brethren have held in the opinion affirming the judgment
in this case, that Greene at the time he admitted to the offi-
cers, Knudsen and Larsen, that he had had sexual relations
with Madge Morey he had in mind and referred to one or
more of the acts of sexual intercourse mentioned in her pur-
ported affidavit. It is manifest that without the admissions,
or, rather, confession of Greene, the evidence would be
wholly insufficient to sustain the verdict of the jury and the
judgment of the court rendered thereon. In fact, without
the confession, there is not sufficient legal evidence in the

record to justify a well-founded suspicion that Greene committed the crime of which he stands convicted. The evidence for the state, which was the only evidence introduced in the case, shows that notwithstanding Madge Morey lived with Greene and his wife at Mt. Pleasant during the time covered by the recitals in the so-called affidavit, Mrs. Greene "didn't suspect a thing" respecting the alleged unlawful relations of Madge Morey and the defendant. Therefore in order to determine whether Greene, in making his confession, referred only to the specific act charged in the information, or whether he referred to and included in the confession acts of sexual intercourse other than the one charged, we must look to the contents of the so-called affidavit, and consider them in connection with what Greene said in making the confession. This will determine whether the jury had before them more than one act of Greene's alleged unlawful relations with Madge Morey. The affidavit recites "that she (Madge Morey) is the mother of an infant son born in Los Angeles, Cal., April 18, 1907, and that one Webster Greene of Mt. Pleasant, Utah, is the father of said infant son; *that she* is unmarried and had *sexual intercourse with said Webster Greene* at Mt. Pleasant *at divers times and occasions* at Mt. Pleasant, Utah, between February 1st 1906 *and October* 1st, 1906, *both inclusive."* (Italics mine.) In fairness to the learned judge before whom the cause was tried, I shall again invite attention to the instruction wherein he charged the jury that the affidavit of Madge Morey was admitted "for the *sole purpose of rendering intelligible the conversation testified to as occurring between the defendant and the witnesses Knudsen and Larsen, and for no other purpose whatever,"* and that it was to be considered by them *"for no other purpose whatever."* The conversation referred to in the instruction, resolving all doubts respecting the order in which it occurred in favor of the state, was, so far as material to the question under consideration, as follows: Upon being informed that the sheriff had come to arrest him, Greene said, "What for?" The sheriff answered, "The Madge Morey business." Greene said,

"What proof have you?" Larsen said, "Yes, Web, you are up against it." Greene said (referring to the purported affidavit), "Well, I didn't think Madge would do that. I don't think that child is mine." Larsen said, addressing Greene, "You don't deny having sexual intercourse with her?" Green answered, "No, sir; I don't." Larsen said, "Does your wife know anything about it, Web?" Greene answered, "No, she doesn't suspect a thing. There are some things that will never be told in this transaction." Now, there is absolutely nothing in this conversation that tends to show that Greene committed the specific act of sexual intercourse charged in the information, namely, the act by which the child of Madge Morey was conceived. The admission made by Greene that he had had sexual intercourse with this woman was general in its terms, and when considered only in connection with the balance of the conversation of which it formed a part, and separate and apart from the affidavit, does not refer to any particular act or acts of sexual intercourse. And the record affirmatively shows that the confession did not include the act of sexual intercourse by which the child mentioned was conceived, the act for which he was tried, because this act he in terms denied. This court in the opinion affirming the judgment against Greene held that, when Greene made the admission referred to, he, in effect, confessed to the truth of the contents of the purported affidavit. In fact, this is the only theory upon which the judgment can possibly be upheld. The court having adopted this theory respecting the relation that the statements of Greene have to the affidavit, we have a case parallel to and on all fours with the Hilberg Case.

The affidavit, in addition to charging that Greene is the father of the child therein mentioned, charges that Madge Morey had sexual intercourse with Greene *at divers times and occasions between February 1st, 1906, and October 1st, 1906, both inclusive*. The court having admitted the affidavit without limiting its application or effect to any particular act of sexual intercourse therein mentioned, its entire contents were before the jury. It will thus be seen that

in the Hilberg Case, as well as in this, the defendant was charged with having had sexual intercourse with a woman not his wife; that as a result of these unlawful sexual relations a child was born; that the defendant in each case was tried for the specific act of sexual intercourse by which the child was conceived; that the defendant confessed to having had intercourse with the woman mentioned in the information, and that in each case evidence was admitted of acts of sexual intercourse other than the act for which the defendant was on trial. The only difference I can perceive in the cases is that in the Hilberg Case the rights of the defendant were much more carefully guarded than were the rights of the defendant in the case at bar. The judgment in the Hilberg Case was reversed because evidence was admitted of adulterous acts other than the one for which the defendant was on trial.

In the case under consideration complaint is made because the court admitted the affidavit mentioned, and thereby permitted to go to the jury, not only the purported statement of Madge Morey which tended to show that she had sexual intercourse with Greene on or about July 18, 1906, the act for which he was being tried, but also her further statement that she had sexual intercourse with him *at divers times and occasions between February* 1, 1906, *and October* 1, 1906, *both inclusive.* Therefore precisely the same question is presented by this appeal that was involved in the Hilberg Case. And the affirmance of the judgment in this case necessarily overrules the Hilberg Case. In the opinion denying the petition for a rehearing reference is made to the following statement appearing in the brief of counsel for appellant, namely: "There is no legal evidence in the record that the act constituting the crime of adultery was committed at any time, but such evidence as there is refers to but a single act committed on the 18th day of July, 1906, if committed at all." It is claimed in the opinion that this is a complete answer to the contention made by appellant that the question of election is in the case and that the court

38 Utah—28

erred in refusing to charge the jury on that point as requested by the defendant. I do not think the statement made by counsel in their brief is a complete answer, nor do I think, in view of the peculiar facts and circumstances of this case as disclosed by the record, that the statement referred to is inconsistent with the contention made by appellant on this phase of the case. The state first introduced proof tending to show that Madge Morey during the year 1906 was a single and unmarried woman, and that on the 18th day of April, 1907, she gave birth to a child. At the time this evidence was offered the district attorney in open court said: "To establish the *corpus delicti* we shall seek to prove that Madge Morey was delivered of a child." And the court admitted the evidence for that purpose. Therefore the act of intercourse alleged to have occurred on July, 18, 1906, was, under the rule announced in *State v. Hilberg,* *supra,* the only offense the court and jury were called upon to try. After much evidence had been introduced to show that Madge Morey was an unmarried woman, and that she had had sexual intercourse with some man on or about July 18, 1906, and evidence of Greene's confession had been received, the purported affidavit of Madge Morey was offered in evidence. The court as hereinbefore stated, admitted the affidavit for the sole purpose of "rendering intelligible" the conversation that occurred between Greene and the two officers, Knudsen and Larsen, at the time Greene's attention was first called to the document. And the court in its instructions charged the jury that the affidavit "was admitted for the sole purpose of rendering intelligible the conversation rferred to," and that "it is not evidence in this case for any purpose, and does not prove or tend to prove in the remotest degree any fact in this case material or otherwise." Counsel for appellant, when they prepared their brief, no doubt assumed, which they were justified in doing, that this court would give the document so restricted and limited in its application as evidence no greater latitude as evidence than was given it by the trial court. Therefore counsel were fully warranted in coming to this court and insisting that

upon the record as made in the lower court there was but one act of adultery in the case—the act of July 18, 1906. And, if this court were to give the affidavit the same effect only as was given it by the trial court, and were to consider it for no purpose other than the one for which it was admitted, there would be no evidence legal or otherwise, in this record connecting the defendant with the commission of the crime for which he was on trial, and the judgment could not upon any plausible theory of the case be sustained. But this court holds, if I correctly understand the import of the opinion affirming the judgment, that the affidavit was not only admissible in evidence for the purpose for which it was received by the trial court, but also as tending to show the particular act or acts of adultery that Greene had in mind and to which he referred when he stated to Knudsen and Larsen that he did not deny having had sexual intercourse with Madge Morey. In the course of the opinion it is said: "Furthermore, the writing [affidavit] handed to and read by the defendant contained the direct and positive statement that he and Madge Morey on divers occasions between February 1, and October 1, 1906, had sexual intercourse with each other at Mt. Pleasant, Utah, and that the defendant was the father of her child born on the 18th day of April, 1907. When confronted by such statement, the only fact therein denied by the defendant, and that but vaguely, was the paternity of the child. . . . He, however, expressly admitted that he had sexual intercourse with Madge Morey. . . . It is but reasonable to infer that such intercourse so admitted by him referred to the *intercourse or intercourses of which he was then charged or accused.*" (Italics mine.) It will thus be observed that this court, in effect, holds that the statements in the affidavit respecting the several acts of sexual intercourse therein mentioned constitute a part of Greene's confession. The fact that the affidavit is susceptible of the application thus made of it by this court I think conclusively shows that the instruction asked for by the defendant should have been given, and that the court erred in giving its instruction No. 4. How can this court say that the jury, not-

withstanding the limitations and restrictions under which the affidavit was admitted in evidence, did not extend its application far beyond the limits fixed by the trial court?

There is not a scintilla of legal evidence in the record that Madge Morey ever saw or heard of this paper which for convenience is called an affidavit. For aught that appears in the record, it may have been prepared in Sanpete County on the day and within two or three hours of the time it was first shown to Greene and the confession hereinbefore mentioned obtained. As original or independent evidence, it was hearsay of the most vicious character. It nevertheless went to the jury as the affidavit of Madge Morey, purporting to contain a statement or statements made by her under the high sanction of an oath charging the defendant with having committed, not only the crime for which he was on trial, but also of having committed like offenses with her "at divers times and occasions between February 1, 1906, and October 1, 1906, both inclusive." The only statement in the document tending to connect the defendant with the particular crime for which he was on trial is the statement that he was the father of the child therein mentioned. This statement the defendant did not admit to be true, but, on the contrary, denied it. The paper served no purpose whatever, except to show, when considered in connection with defendant's confession, that he had committed adultery with Madge Morey "at divers times and occasions" other than the act of adultery charged in the information. The paper therefore was immaterial and incompetent for any purpose. But, the court having admitted it without limiting its effect as evidence to the particular act of adultery for which the defendant was on trial, the defendant was entitled to have the jury charged on the question of election as requested by him, and I am clearly of the opinion that the court erred in giving its instruction No. 4. If the doctrine of the Hilberg Case were followed, the judgment in this case would have to be reversed, regardless of the court's instructions or its failure to instruct on the issues. In the Hilberg Case, as I have hereinbefore pointed out, evidence was admitted of alleged

adulterous acts of the defendant with the woman named in the case other than the act charged in the information. Notwithstanding this evidence was admitted for the purpose only of showing the associations of the parties, and that the court so instructed the jury, and, in addition thereto charged on the question of election substantially as the court was requested to charge in this case, this court nevertheless reversed the judgment and ordered a new trial.

In the opinion overruling appellant's petition for a rehearing it is said: "Where time is not an essential ingredient in the offense, to hold that the state is required to prove the alleged offense at or about the particular time stated in the information and may not prove it at any other and prior time within the statutory period of limitations is contrary to our knowledge of the criminal law. Such a charge is not open to the objection urged by counsel that the jury could assume that there was evidence in the case of several or different offenses similar to the one charged (in this case there was such evidence and it was furnished by means of the affidavit mentioned), and that they were at liberty to convict the defendant of any one of them if committed within the statutory period of limitations. As well say in a case of larceny or murder that the jury under such a charge could assume that there was evidence of several or different larcenies or murders similar to the one charged, and that they were at liberty to convict the defendant of any one of them if committed by him within the statutory period of limitations." In answer to the first proposition above stated, I will say that should a case of larceny arise where the evidence introduced by the state tended to show that the defendant had committed several separate and distinct larcenies of the same property from the same party— the party named in the information—and each larceny constituted a transaction by itself separate and apart from each of the others, the defendant undoubtedly would be entitled to have the state elect upon which larceny it would rely for a conviction and to have the jury instructed thereon. In answer to the second proposition, it is sufficient to say that

a person can be the victim of a homicide but once. That is, the victim cannot be killed the second time. I think a better and more apt illustration would be to suggest a case in which the defendant is charged with an assault with intent to commit murder and at the trial evidence is received tending to show that the defendant "at divers times and occasions" committed other assaults on the party mentioned in the information similar to the one therein charged. In such case I take it that it would not be seriously contended that the defendant would not be entitled to have the state elect on which assault it would rely for a conviction and to have the jury properly instructed thereon.

In the opinion denying the petition for a rehearing, it is further said: "The state offered no evidence and made no attempt to prove several offenses of adultery or different adulterous acts or transactions committed by the defendant with Madge Morey. The evidence was directed to but one transaction, the one alleged in the information." I am unable to reconcile what is here said with the position taken by this court in the original opinion respecting the application there made of the affidavit as evidence in the case. Notwithstanding anything that this court may have said in either of the opinions the fact remains that the purported affidavit was admitted in evidence, and that it contained statements purporting to have been made under oath by Madge Morey that she had sexual intercourse with the defendant "on divers times and occasions" other than the occasion alleged in the information. I shall, however, for the sake of argument, assume that there was but one adulterous act or transaction in the case, namely, the transaction alleged in the information. Now, the transaction alleged, and the one for which the defendant was placed on trial, was the act of adulterous intercourse by which the child of Madge Morey was conceived. This was the only act of sexual intercourse that the defendant was legally called upon to deny or to defend against. And I respectfully submit that the evidence is wholly insufficient to support a finding by the jury that the defendant is guilty of the act charged, and for which he was tried.

When shown the affidavit, the defendant said, as I have heretofore pointed out, "Well, I didn't think Madge would do that. I don't think that child is mine." Then Larsen said, "You don't deny having sexual intercourse with her?" The defendant replied, "No, sir; I don't." While this was an admission or confession on the part of Greene that he had sexual intercourse with Madge Morey, it was not an admission or confession that he was guilty of the act charged in the information, because he in terms denied that particular act. In other words, he denied the act charged, but admitted that he was guilty of other adulterous acts with Madge Morey. In fact, no claim is made that he admitted the act for which he was placed on trial. This court in the original opinion affirming the judgment, referring to Greene's statement, says that he "vaguely denied the paternity of the child." Therefore I take it that it is established that Greene did not admit or confess that he committed the offense charged in the information, but, on the contrary, denied (even though vaguely) that he was guilty of that particular offense. True, in that same conversation Greene expressed a willingness to plead guilty to fornication, but that cannot, even by the utmost stretch of the imagination, be construed as an admission that he committed the act for which he was tried. At the time the conversation mentioned took place no complaint had been filed against defendant charging him with having had adulterous relations with Madge Morey; hence it cannot be said that, when he stated that he was willing to plead guilty to fornication, he had in mind the particular act which he had just denied. The only fair inference that can be drawn from what was said is that Greene, when he offered to plead guilty, had in mind the act or acts of sexual intercourse which he admitted having had with Madge Morey.

I do not think it will be seriously contended that the other evidence introduced at the trial standing alone is sufficient to create a well-founded suspicion that Greene is guilty of the crime for which he was tried. We therefore have a case, as I read the record, where the defendant is tried for one offense and convicted of another.

For the reasons stated, I am forced to the conclusion that a rehearing should be granted.