# STATE v. INLOW.

No. 2556. Decided April 24, 1914. On Application for Rehearing,

June 8, 1914 (141 Pac. 530).

1. HOMICIDE—INFORMATION—SUFFICIENCY. An information charging that there was inflicted upon and in the body of deceased one mortal wound, from which mortal wound deceased languished a short time, and then on a certain day, at the county and state, etc., died, is not defective in failing to charge that deceased languished and died from the wound inflicted. (Page 492.)

2. CRIMINAL LAW—RIGHT TO CONFRONT WITNESSES—CONSTITUTION. Const. art. 1, section 12, giving an accused the right to be confronted with witnesses against him, is not violated by the admission of testimony of witnesses taken at the preliminary hearing, who were shown to have been absent from the state at the time of the trial.[1] (Page 493.)

3. CRIMINAL LAW—CONSPIRACY—EVIDENCE. While a conspiracy cannot be established by the acts and declarations of only one of the alleged co-conspirators so as to render such acts and declarations admissible against accused, yet a conspiracy may be established by circumstantial evidence, and in such case the acts of one co-conspirator are admissible against the other. (Page 494.)

4. CRIMINAL LAW—EVIDENCE—SUFFICIENCY. In a prosecution for homicide, evidence held sufficient to show that accused and his wife were co-conspirators, and hence evidence of the acts of his wife was admissible. (Page 494.)

[1] State v. King, 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808; State v. Vance, 38 Utah, 1, 110 Pac. 434; State v. Greene, 38 Utah, 389, 115 Pac. 181.

5. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY. In a prosecution for homicide, where there was sufficient evidence to show that accused and his wife were co-conspirators, a coat worn by the wife on the evening of the homicide, and which was spattered with blood, is admissible in evidence. (Page 497.)

6. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY. Where the state introduced in evidence a coat worn by accused on the night of the murder, and the state chemist testified that blood stains on the coat were from the blood of mammals, but refused to give an opinion whether it was human blood, the chemist may also testify that, in making the test, he compared it with his own blood, for, in making such tests, a comparison with mammalian blood is always made. (Page 497.)

7. HOMICIDE—EVIDENCE—ADMISSIBILITY. Where the state contended that accused killed deceased to prevent the latter from testifying against him in a prosecution for burglary, evidence by police officers as to a conversation with accused, wherein they informed him that deceased would be a witness against him, is admissible to show motive, although the state should not go into the particulars of the other offense. (Page 498.)

8. CRIMINAL LAW—APPEAL—PRESUMPTION. Where the court allowed the state to contradict its own witness, who changed her testimony from that given on the preliminary hearing, it may be presumed, in support of the ruling, that the state was taken by surprise, and hence had the right to interrogate the witness respecting her previous statements. (Page 499.)

9. WITNESSES—EXAMINATION—DISCRETION OF COURT. Where a party is taken by surprise by the testimony of his own witness, he may, within the sound discretion of the court, interrogate the witness respecting previous statements or testimony inconsistent with his present testimony. (Page 499.)

10. CRIMINAL LAW—APPEAL—INVITED ERROR. Where a witness called by the state testified contrary to her testimony at the preliminary hearing, and the prosecutor interrogated her as to that testimony, accused cannot on appeal complain that the witness' former statements were not wholly withdrawn from the jury, where his own request on that point was substantially given. (Page 500.)

11. CRIMINAL LAW—APPEAL—HARMLESS ERROR. The erroneous admission of evidence is not prejudicial, where it was stricken from the record, and the jury admonished to disregard it. (Page 501.)

12. CRIMINAL LAW—TRIAL—ARGUMENT OF COUNSEL. Where the state claimed that accused killed deceased to prevent the latter from testifying against him in a prosecution for burglary, it is im-

proper for the state's attorney to refer to accused's failure to introduce witnesses in support of his defense to the charge of burglary, as such evidence would have been immaterial and irrelevant.    (Page 502.)

13. CRIMINAL LAW—APPEAL—HARMLESS ERROR.   But this misconduct was harmless where the court admonished the jury that their verdict must be based upon the evidence and not upon statements of counsel, for the jury must have understood that the evidence referred to was immaterial and irrelevant.   (Page 502.)

14. CRIMINAL LAW—CONSPIRACY.   In determining whether accused and his wife were co-conspirators in killing deceased, the fact of their relationship may be considered.   (Page 504.)

ON APPLICATION FOR REHEARING.

15. HOMICIDE—TRIAL—INSTRUCTIONS.   In a prosecution for homicide, the refusal of the trial court to instruct the jury as to the punishment imposed for the various degrees of homicide is not error, for the punishment is assessed by the court and not by the jury, although the court may, in its discretion, charge the jury on such matter.[2]   (Page 505.)

APPEAL from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Caleb A. Inlow was convicted of murder in the second degree.   He appeals.

AFFIRMED.

*E. A. Walton* and *Willard Hanson* for appellant.

*A. R. Barnes,* Attorney-General, *E. V. Higgins* and *G. A. Iverson,* Assistant Attorneys-General, and *E. O. Leatherwood,* District Attorney for the State.

FRICK, J.

The defendant, appellant here, was charged with murder in the first degree, and upon a trial was convicted of murder in the second degree.   While appellant was informed against

---

[2] State v. Dye, 44 Utah, 190, 138 Pac. 1193; Brannigan v. People, 3 Utah, 488, 24 Pac. 767; 21 Cyc. 1071.

alone, the state nevertheless tried the case upon the theory that his wife was a co-conspirator or accomplice of his, or acted in concert with him in the perpetration of the murder.

The salient facts relating to the homicide, briefly stated, are in substance as follows:

One Thomas E. White, called "Eddie White" in the evidence, a chauffeur by occupation and about twenty-three years of age, was found dead in his automobile, a taxicab, so called, at about six or six fifteen o'clock on the morning of October 5, 1912, on Third East Street and a little below Ninth South Street in Salt Lake City. Death was apparently caused by bullet wounds. One bullet entered the back of the head or neck, passing through the spinal column, severing the spinal cord, and ranging upward somewhat it passed through the brain and out at about the center of the forehead. The other bullet entered the head just back of and a little below the left ear, passed through the brain, and passed out just back of and a little below the right ear. Either bullet inflicted a mortal wound. There were also other bruises on the head of the deceased made by what the doctors denominated a blunt instrument, but those were not fatal. There were powder burns showing that the shots were fired at close range. There was evidence that robbery was not the motive for the murder from the following facts and circumstances: The deceased, when found, had evidently been dead for some hours. He had on his person, when found, twenty-five dollars in cash, a diamond ring, a signet ring, a gold watch, and other trinkets of less value, all of which, the testimony showed, belonged to him. The taxicab in which he was found was lighted on the night of the murder by electricity, but the wires connecting the lamps had been severed from them, and thus the front or headlights were extinguished. The rear or "tail" light was an oil lamp, which, according to the evidence, was still burning when the taxicab was discovered on the morning of October 5th, as aforesaid.

The appellant was a resident of Bingham Canyon, a mining town about twenty miles distant from Salt Lake City. He and his wife came to Salt Lake City on the 4th day of

October, the day preceding the death of White, to make preparation for the preliminary hearing of appellant upon a charge of burglary in the second degree which had been preferred against him. Just what time the appellant, his wife, and a little girl related to them or one of them arrived at Salt Lake City on the 4th is not made to appear. Appellant, at about eight thirty on that evening, engaged a room for himself and wife in a rooming house located at No. 78 East Second South Street, nearly a block distant from where the deceased usually kept his taxicab on the public street in front of what is known as the Kenyon Hotel. When appellant engaged the room, he registered as "Henry Stone and wife." Some time after engaging the room, he went away, and some time thereafter he, his wife, and the little girl referred to came back, bringing with them a suit case. They left the suit case in the room, and appellant's wife and the little girl went to the home of friends, a Mr. and Mrs. Schneider, in the city, about a half mile or so distant from the rooming house, where they arrived a little after nine o'clock. Where appellant went after leaving the rooming house is not shown. A little before ten o'clock, as testified to by Mrs. Schneider on cross-examination by appellant's counsel, appellant's wife left the Schneider home, saying she was going up town to meet the appellant, leaving the little girl in bed at the Schneiders. Before leaving the Schneiders, she borrowed a long, dark coat and a veil or scarf from Mrs. Schneider. She left her hat at Schneider's, and tied the veil or scarf over her head, and also put on the coat. She was next seen at about eleven-thirty p. m. standing in front of the National Bank of the Republic, which is immediately opposite the Kenyon Hotel in front of which the taxicab of the deceased was usually standing when not in actual service. Just before twelve o'clock midnight, a woman wearing a long dark coat and a veil or scarf tied over her head, and without a hat, appeared where the taxicab of the deceased usually stood and inquired from another chauffeur, who was in attendance at his automobile, about Mr. White's car, and asked the chauffeur in question about

Mr. White, the deceased. The chauffeur offered her the use of his automobile, but she said she wanted a taxicab. The deceased was away from his car at the time, and the chauffeur so informed Mrs. Inlow, and she waited, apparently for the deceased to return, which he did in a few minutes, and when he did so he was pointed out to her by the chauffeur. She then spoke to the deceased, but what was said between her and the deceased was not heard by the other chauffeur. The deceased immediately opened the side door of his taxicab, and she entered the car. After she had entered the car, the deceased again opened the side door and apparently received an order or direction from her, after which he got on the driver's seat and drove south on Main Street. He drove away either a minute or two before or the same length of time after twelve o'clock midnight. That was the last time deecased was seen alive. He was found the next morning about a mile and three-quarters from where he started, and in a southeasterly direction from the hotel he started from with Mrs. Inlow. Mrs. Inlow was next seen at about twelve twenty-seven or twelve twenty-eight a. m. in company with a man, who was not recognized by any one, to enter a street car at the intersection of State and Ninth South Streets, a little over two blocks distant from where the deceased was found dead in the taxicab on the morning of October 5th, as aforesaid. She rode in the car north on State Street, and was next seen at the rooming house with her husband, the accused, a little after twelve thirty; that is, between twelve thirty and twelve forty-five a. m. Where she alighted from the car, and who the man was that was with her when she entered the car, no one seemed to know. She and her husband, the appellant, immediately left the rooming house, taking the suit case they had left there earlier in the evening with them. Before going the appellant attempted to erase the name of Henry Stone and wife from the register. They were next seen at the Schneider home, where they arrived about one o'clock, and they slept there in a room together that night. The next day they were both arrested, and the long dark coat worn by Mrs. Inlow

and the suit case and another long coat which it was claimed belonged to the appellant, and which he was seen wearing the night of the murder, were all found in the room in which the Inlows slept after one o'clock on the night aforesaid. There were some blood stains found on the coat which was alleged to have been worn by appellant, and the coat also contained indications of having been sponged or washed along the upper front part.

On the night of the murder appellant appeared at the place where the deceased usually kept his taxicab for hire and inquired from the chauffeur there in attendance where the deceased lived, whether he was married or unmarried, where his telephone was, etc. Upon receiving the information and being told where the telephone was which was used by the deceased, and which was immediately across the street from where the taxicab was kept, the appellant went across the street to the telephone and was there seen and spoken to by the proprietor of the saloon where he went in search of the telephone. This was about ten thirty p. m., or a little thereafter. The appellant was not seen by any one so as to identify him thereafter until he and Mrs. Inlow arrived at the rooming house, as stated above. About twelve fifteen or twelve twenty a. m. on the morning of October 5th, two shots were heard in the vicinity of where the taxicab with the dead body of the deceased were found by at least two persons. A witness also testified that at about that time of night he was walking near where the deceased was killed, and he saw the lights of an automobile approaching towards him from the south; that he saw the automobile stop, and soon thereafter heard two shots. and saw the lights go out, or that they went out, and then saw two persons, one tall and one shorter, apparently dressed in long coats, leave the automobile, and he immediately afterwards passed to the west of the automobile and saw a person in it on the driver's seat, but the witness supposed that the person he saw there was intoxicated and paid no further attention to the automobile. The taxicab was found in a somewhat lonely and unfrequented part of the city. The night of October 4th

was dark, and the sky was overcast with clouds, but, according to the witness just referred to, there were occasional intervals of starlight. Considerable rain fell between the hours of one and three thirty o'clock on the morning of the 5th of October. The chauffeur to whom Mr. and Mrs. Inlow spoke on the night of the murder, and who described their appearance, thereafter also identified them as the persons who made the inquiries about the deceased, as before stated. The state also proved that the deceased was the principal witness against the appellant on the burglary charge to which reference has been made, and that Inlow was by the police officers of Salt Lake City apprised of that fact.

, The blood stains on the coat which the witnesses said was worn by appellant on the night of the murder were tested by the state chemist, and he stated that the blood obtained from the stains was that of a mammal, but he was unable to state that it was human blood. The usual microscopic test was made as indicated in Stewart's Legal Medicine, p. 319 et seq.

There were many other facts and circumstances which, at least to some extent, were either corroborative of those detailed or which in some degree tended to establish the theory of the State.

The appellant produced evidence which tended to controvert some of the evidence of the state, but, in order to bring this opinion within reasonable bounds, we cannot go into detail respecting those matters.

The appellant has assigned no fewer than 124 separate errors, fifty-four of which counsel have argued in their brief. They insist, however, in advance, that they do not waive any of the assignments.

While we have carefully examined and considered all of the assignments in the consultation room, we, in this opinion, shall discuss only such as are deemed meritorious. The first contention is that the information filed against appellant is insufficient. The shooting charged to have taken place on the 5th day of October is pleaded in the usual manner, and that charge is followed by the charge

that there was inflicted "upon and in the body of him (the said Thomas E. White) one mortal wound, from which mortal wound the said Thomas E. White *languished a short time, and then* on the 5th day of October, 1912, at the County of Salt Lake, State of Utah, died." (Italics ours.) It is contended that it is not charged that death resulted from the mortal wound described in the information. In our opinion this contention is not tenable. Even if it be conceded that the words set out in italics are essential and should be considered, yet it is quite clear that the information charges that death resulted from the wound inflicted, and from nothing else. If it were not for the italicized words, no one, we think, would seriously contend that the charge is not entirely specific and certain. A charge in the same language was held sufficient by the Supreme Court of Pennsylvania in *Lutz v. Commonwealth,* 29 Pa. 441. Upon the other hand, a charge like the one here in question was held uncertain by the Supreme Court of Montana in *State v. Keerl,* 29 Mont. 508, 75 Pac. 362, 101 Am. St. Rep. 579. We do not consider the last case well decided. It certainly is clear that the information charges that the deceased "languished" from the mortal wound inflicted. Is it not just as clear that it is charged that he died therefrom? We can see no escape from the conclusion.

It is next contended that a substantial right of the appellant as found in article 1, section 12, of our Constitution, namely, the right "to be confronted by the witnesses against him," was disregarded by the trial court in permitting the testimony of certain witnesses taken at the preliminary hearing, and who were shown to be absent from the State of Utah at the time of the trial to be read in evidence by the state against the appellant. This precise question has been passed upon by this court in the following cases: *State v. King,* 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808; *State v. Vance,* 38 Utah, 1, 110 Pac. 434; and in *State v. Greene,* 38 Utah, 389, 115 Pac. 181. Counsel for appellant, however, insist that the later decisions referred to above are all based on the case of *State v. King,*

*supra,* and that that case was not well decided. In deference to counsel's earnest argument, we have again examined the question, and, after doing so, we are firmly convinced that the decision in *State v. King* is entirely sound. Under constitutional provisions precisely like ours, it has frequently been held that the testimony of a witness taken at the preliminary hearing or former trial, in case such witness has since died, become insane, or departed from the state, where the accused was afforded an opportunity of cross-examination, such testimony taken as aforesaid may be read in evidence against the accused. We refer to the following cases as directly in point: *Lowe v. State,* 86 Ala. 47, 5 South. 435; *Jacobi v. State,* 133 Ala. 1, 32 South. 158; *State v. Nelson,* 68 Kan. 566, 75 Pac. 505, 1 Ann. Cas. 468; *Wilkins v. State,* 68 Ark. 441, 60 S. W. 30; *Hair v. State,* 16 Neb. 605, 21 N. W. 464. In a much later case than the one referred to in *State v. King, supra,* the Supreme Court of California has held that the testimony of witnesses, when taken as above indicated, may be read in evidence in a homicide case. See *People v. Chin Hane,* 108 Cal. 597, 41 Pac. 697. This assignment must therefore fail.

We shall next take up the assignment relating to the alleged conspiracy. It is vigorously contended by counsel for appellant that all of the acts and declarations of Mrs. Inlow were improperly admitted in evidence against appellant for the reason that no legal evidence of a **3, 4** conspiracy, agency, or of a common purpose was produced by the state. The assignments in that regard are very numerous and are not limited to the acts and declarations of Mrs. Inlow alone, but relate to other acts and declarations which we need not enumerate. If we shall conclude, therefore, that there was sufficient evidence upon the question of conspiracy or concert of action between appellant and his wife to commit the charged offense or some unlawful act connected therewith, to take that question to the jury, we shall have disposed of a large number of separate assignments. It is quite true, as counsel for appellant contend, that a conspiracy may not be established from the acts

and declarations of only one of the alleged conspirators. It, however, is also true that a conspiracy or common purpose may be shown by circumstantial evidence and by inferences deduced from other proved facts. In the recent case of *State v. Fields,* 234 Mo. 615, 138 S. W. 518, the objections to evidence seem to have been about as numerous and of practically the same character as are those in this case. The Supreme Court of Missouri, in that case, speaking through Mr. Justice Kennish, in passing upon the question of when acts and declarations of third persons are admissible against one charged with an offense, states the rule thus:

"To entitle the state to introduce in evidence against the person on trial the acts and declarations of another relative to the offense charged, it is essential that the existence of a conspiracy or common purpose between the defendant and the alleged co-conspirator to commit the crime charged be shown, but the law does not require direct and positive evidence of such conspiracy. It is sufficient if it may be inferred from the facts and circumstances in evidence."

A mere cursory reading of the facts in that case will disclose that there were fewer and weaker facts from which a conspiracy or common purpose could be inferred than in the case at bar, but, notwithstanding that fact, the Supreme Court held the facts there shown were sufficient to authorize a submission of that question to the jury.

In *Kelley v. People,* 55 N. Y. 565, at page 575 (14 Am. Rep. 342), the facts, in our judgment, from which a conspiracy or common purpose could have been inferred were far more meager than they are in this case. The court, however, in referring to the question of conspiracy, says:

"There was abundant evidence to justify the conclusion that the parties were all acting with a common purpose and a common design, and, although there may have been no previous combination or confederacy to commit this particular offense, the conduct and actions of the several parties, and the parts they severally performed in the actual perpetration of the crime, were sufficient to make the acts and declarations of each, from the commencement to the consummation of the offense, evidence against the others. A conspiracy may be proved, as other facts are proved, by circumstantial evidence, and parties performing disconnected overt acts,

all contributing to the same result and the consummation of the same offense, may, by the circumstances and their general connection or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense. One party may allure the victim into the den, leaving it to others to effect the robbery, and all will be held equally guilty as confederates."

To the same effect are the following well-considered cases: *Ferguson v. State*, 134 Ala. 63, 32 South. 760, 92 Am. St. Rep. 17; *Davis v. State*, 114 Ga. 104, 39 S. E. 906; *State v. Lewis*, 51 Or. 467, 94 Pac. 831; *State v. Dilley*, 44 Wash. 207, 87 Pac. 133; *Spies v. People*, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320; *People v. Rodley*, 131 Cal. 240, 63 Pac. 351; *People v. Daniels*, 105 Cal. 262, 38 Pac. 720; *State v. Adams*, 20 Kan. 311, 321. In the last case cited Mr. Justice Brewer says:

"It is not essential that the state establish beyond peradventure that the acts or conduct were based upon the conspiracy, or in reference to the crime; it is enough that they harmonize with and tend to confirm the charge of the conspiracy, and are reasonably indicative of the preparation for the crime."

The rule respecting the admissibility and relevancy of evidence under circumstances like those in the case at bar is very clearly stated by Mr. Justice Straup in a case decided at this term and not yet published, namely, *State v. Tidwell*, 44 Utah, 248, 139 Pac. 863, in the following words:

"To be relevant and admissible, it is not essential that proffered evidence be by itself sufficient to establish a disputed point or fact in issue, nor is it required to be addressed with positive directness to such point or fact. It is receivable if it by itself, or in connection with other evidence, renders probable or improbable, or logically tends to prove or disprove, a disputed point or fact in issue."

Applying the foregoing rule to all acts and conduct of both the appellant and his wife, and considering them together, as they must be, then the acts of each were clearly admissible in evidence and were ample to justify a finding by the jury that appellant and his wife were actuated by a common purpose or were endeavoring to accomplish the same end.

In some of the cases cited, if not in all, the contention that the court erred in admitting in evidence the acts and conduct of Mrs. Inlow in taking the street car on the night in question after the murder in all probability had been committed is also answered. Her acts and conduct in that respect were admissible for the same reason that her other previous acts were admissible; something still done by her in the furtherance of the conspiracy.

In *Ferguson v. State, supra,* the Supreme Court of Alabama, in referring to this question, held that acts and conduct after the direct object of the conspiracy is accomplished, but still so closely connected therewith as to be a part of it, are nevertheless admissible in evidence and may be considered if "they are such as under all the circumstances may afford ground for inference that such conspiracy existed."

. What we have here said also sufficiently answers the contention that the coats, one of which it was contended by the state was worn by appellant and the other by his wife, were improperly admitted in evidence. Nor is the contention tenable that those and other articles introduced in evidence were not sufficiently identified to authorize them to be introduced in evidence before the jury.

It is next contended the court erred in permitting the state chemist to testify that, after making tests of blood stains found on the coat shown to have been worn by appellant on the night of the murder, he made a test of blood taken from his own finger and compared it with the test made from the blood stain on the coat. The chemist testified that he had scientifically demonstrated by the test he made that the blood obtained from the stain found on the coat was the blood of a mammal, and that, after he had compared it with his own blood, no other result was either obtained or expected by him. But the chemist, as an expert, also testified that, in making a test for mammalian blood, the expert making the test usually, if not always, also compared it with a test of human blood, if obtainable, or of the blood of some other known mammal, and that in that

44 Utah 32

way more certainty is attained that the blood actually tested
and found in a stain is or is not mammalian blood. The
chemist also said that in making the test, as made by him,
all that could be demonstrated with certainty was that the
blood found on the coat aforesaid was that of a mammal,
and thus might be the blood of a human being or of some
other mammal. But the chemist refused to give an opinion
that the blood in question was human blood. We are of the
opinion that the court committed no error in permitting the
chemist to testify, as he did, as to the manner he made the
test and the method employed by him in making it.

It is further contended that the court erred in permitting
the police officers to testify to a conversation they had with
the appellant at or about the time of his arrest on the
burglary charge. This conversation was offered by
the state and admitted by the court to show that the
appellant had knowledge that the deceased knew the
facts, or at least some of them, concerning the burglary with
which the appellant was charged, and in all probability
would be a witness for the state against appellant on that
charge. Appellant's counsel concede that, for the purpose
of showing motive on the part of appellant, the state had
the right to show that he was charged with a certain offense,
and that the deceased would be a witness against him; but
they contend that the state was in this case permitted to go
into the particulars of that offense, which it had no right
to do. The law, no doubt, is as contended for by appellant's
counsel in the foregoing statement, except that the state
had the right to show what knowledge the appellant had of
what facts concerning that offense the deceased knew and
might testify against him. We remark that while it may be
true that, in the statements made by the policemen, more
may have been said than was actually necessary to apprise
appellant of the fact that the deceased knew about appel-
lant's connection with the burglary charge, and that the for-
mer would probably be called by the state as a witness against
the latter, yet the state disclaimed any purpose of attempt-
ing to go into any of the particulars of the burglary charge,

and, as we read the record, such was really not done. In our opinion the state did not exceed its right with respect to presenting the facts from which a motive could be inferred, nor in showing that the appellant was apprised of what the deceased knew with regard to the burglary charge.

The state called a witness, a young girl, to show that the appellant was in the street car boarded by his wife on State Street. She testified, in response to questions asked her by the prosecuting attorney, that she thought the person was a man by the name of Pinlough, residing at Bingham, and not the appellant. Then she was asked by the prosecutor if she had not testified at the preliminary hearing that it was the appellant. Over the defendant's objection she answered that she had, but that since that hearing she had become convinced that she was mistaken as to that, and that it was not the appellant, but Pinlough. It is urged the State was permitted to impeach its own witness and improperly get before the jury what the witness had testified to at the preliminary examination. Counsel for the State did not in words state nor make the claim that he was surprised by the testimony of the witness. It may be presumed in support of the ruling, however, that it sufficiently was made to appear to the court that the prosecuting attorney was taken by surprise, and hence had the right, within the sound discretion of the court, to refresh the recollection of the witness by calling her attention to her former testimony. Where a party is taken by surprise by the testimony of a witness called by him, the prevailing rule is that he, within the sound discretion of the court, may interrogate the witness respecting his previous statements or testimony inconsistent with his present testimony. The rule is stated in 3 Jones on Evidence, section 858, in the following words:

"Although the weight of authority sustains the view that a party cannot prove the contradictory statements of his own witness to discredit him, yet *the party is not wholly without remedy, if surprised or deceived* by the testimony. In such a case, he may interrogate the witness in respect to previous statements inconsistent with the present testimony, for the purpose of probing his recol-

lection. He may, in this way, show the witness that he is mistaken,. and give him an opportunity to explain the apparent inconsistency. . . . If the recollection of the witness is not refreshed after such questions, the party *cannot prove* his *contradictory statements by other witnesses.*"

Upon the record, we do not think it is made to appear that the court abused its discretion in what was done.

Appellant's counsel asked the court to instruct the jury so as to limit the effect, as they call it, of the witness' statements. The court said that it would do so, and in that connection said:

"I think the court is bound to instruct the jury that there is no evidence that any statement that she (the witness in question) may have made in the court below (on the preliminary hearing) cannot be considered as evidence here, and that there is no evidence before this court here that the defendant was on the street car on State Street."

The State consented to this limitation. Counsel for appellant, however, did not seem satisfied, and offered their own instruction in which they requested the court to charge as follows:

"The evidence of the witness Ethel Pace, given by her, to the effect that she testified on the preliminary hearing, as to the identity of the defendant C. A. Inlow, that the person said to have been seen by her on the Sandy car on the night of October 4-5, 1912, is not in any sense evidence of said identity, but, on the contrary, is only to be considered by you for the purpose of determining the credit to be given to the witness and her truthfulness or untruthfulness."

This request the court gave in substance, and in view of that counsel cannot now complain that their client has been prejudiced because the effect of the evidence was not wholly withdrawn from the jury for every purpose.

The court, on its own motion, also charged the jury that the testimony of the witness, given on the preliminary hearing, in no event could be considered by them "more favorable to the state than if such statement or admission had not been made." In other words, the court told the jury that the

state was without evidence whatever upon the question that appellant had entered the street car in question, and, if it had not been for counsel's request, it seems all of the witness' former statements would have been entirely eliminated from the record for every purpose.

We remark that the case of *State v. Callahan*, 18 S. D. 145, 99 N. W. 1099, relied on by counsel for appellant, is clearly distinguishable from the case at bar. The attempt there made to get the testimony of a witness known to be adverse to the state before the jury was clearly improper. No such attempt was made here. All that counsel for the state did was to call the witness' attention to her former testimony, which was directly contrary to what she testified to at the trial. This, as we have seen, they had a right to do. For the reasons stated, therefore, this assignment cannot prevail.

It is also insisted that the trial court erred in permitting the state to show that appellant had made a threat to the effect that the burglary charge would never come to trial. This threat, it was alleged by the state, was made in a conversation between appellant and a newspaper editor, in which conversation appellant requested the editor not to publish the story concerning the burglary charge. The court permitted the editor to detail the whole conversation had between him and appellant, and, when such had been done the court, on motion of appellant's counsel, struck all that was said from the record and admonished the jury to disregard all that was said by appellant to the newspaper editor, and all that the editor had said to him with regard to the matter. The court, after hearing all that was said, held that, as a matter of law, what was made to appear did not amount to a threat, and at once eliminated all that was said from the record. We cannot see how any prejudice could have resulted to appellant in what occurred in that regard.

It is next urged that the court erred in its definition of malice. The court, however, substantially followed the definition of malice, as given in Comp. Laws 1907, section

4053, subd. 4. Appellant, therefore, has no cause for complaint.

It is also contended that appellant was prejudiced by the misconduct of the district attorney in his argument to the jury. Four separate instances of misconduct are assigned as error. The first to be noticed arises as follows: In the conversation had between appellant and the police officers, to which reference has been made and in which the officers informed appellant that the deceased knew, or claimed to know, of the facts concerning the burglary charge by which appellant was charged with taking certain valuable specimens of ore from a certain home in Salt Lake City, and from which conversation it was also made to appear that appellant said that he had obtained the specimens which it ws charged he had taken from the house aforesaid from one Robinson in exchange for other specimens belonging to appellant, the district attorney, in his argument to the jury, propounded the question: "Where is Robinson?" In the portion of the argument wherein the expression occurred, the district attorney was arguing the question of motive on the part of appellant. The burglary charge, and that the appellant was apprised of the fact that the deceased claimed to know that appellant was connected with that offense, and that the deceased might be a witness for the state, were admitted for the sole purpose of showing motive. It was therefore proper to argue to the jury that appellant had a motive to silence the deceased as a witness, but it was not proper for the district attorney to propound the question he did in that connection. Assuming Robinson existed, he could not have testified in the murder case that he had exchanged the ore specimens with appellant. That fact was wholly irrelevant. While it was proper for the district attorney to call attention to any material and relevant evidence that was not produced, which was shown could better have been produced by the defense than the state, yet it was improper to argue to the jury that certain evidence was not produced which was immaterial or irrelevant. See 12 Cyc. 578. We cannot yield assent to the contention, however,

that the district attorney's statement referred to, when considered in connection with all that he said on the subject, in any way was sufficiently prejudicial to require a reversal. The matter was wholly collateral to any issue directly involved in the charge for which appellant was on trial. The jury could not have been misled by the statement made by the district attorney. They could not have assumed from what he said that, if Robinson had been called as a witness, he could have in any way aided appellant by shedding light on the charge for which he was being tried. Had the district attorney intimated that Robinson could have done that, and any statement that Robinson could have made in that regard would have been incompetent and irrelevant as evidence, then the statement made by the district attorney, which is excepted to, would have been within the rule above referred to. It was quite as evident to the jury as it was to any one else, however, that any statement that Robinson might have made respecting the exchange of ore samples could in no way have thrown any light whatever on the charge for which appellant was on trial. Courts are not authorized to reverse judgments and set aside verdicts for every breach of this character. If jurors possess sufficient intelligence to sit in a case at all, they possess sufficient not to be influenced by every misstatement that may be made in their presence by the attorneys. Besides, the trial court, over and over again, admonished the jury that they must not be influenced by any statement of counsel but must be guided by and base their verdict solely upon the evidence produced in the case. All this was again repeated in the general charge. While, therefore, the district attorney may technically have transgressed in making the statement, yet we are clearly of the opinion that the transgression in no way was prejudicial to appellant's rights.

The other three instances of misconduct require no separate discussion. The one discussed was the most serious one, and all have been sufficiently answered by what has been said.

It is next contended that the court erred in its charge to the jury. Complaint is made that the court did not sufficiently define and explain what is meant and understood by conspiracy. We have carefully read the whole charge, and while that particular part relating to what is understood and meant by conspiracy is not happily worded, nor as specific as it might well have been made, and thus should not be taken as a model, yet, when considered as a whole, it does not misstate the law against the appellant, nor could it have misled the jury. Indeed, the charge, in some respects, is more favorable to appellant than the law warranted.

It is also urged that the court erred in charging the jury that, in determining the question of agency or common purpose, the mere fact that the appellant and Mrs. Inlow sustained the relation of husband and wife could not authorize the jury to infer such agency or common purpose, but that the fact of such relationship may be considered, in connection with other facts and circumstances in evidence, to determine whether the defendant knowingly utilized her acts to accomplish a design of his own." This, it is contended, is meaningless; and further that the relationship may not be considered for such a purpose. While the charge may not be as clear as it could be made, yet it does not, as counsel contend, misstate the law. What is said is a simple recognition of the principle that friendship and relationship may be considered in determining whether parties who are friends or related probably had a common interest or a common purpose, and that they connived and confederated together to accomplish such a purpose. As is said by Mr. Justice Brewer in a similar case already referred to, namely, *State v. Adams, supra,* strangers do not usually conspire, but it is more probable that friends or relatives, or even acquaintances, will do so.

While we have carefully gone over all of the other numerous assignments, yet we have found none which, in our judgment, merits further consideration. Notwithstanding counsel's most vigorous contention that the record teems with errors and that the "evidence is wholly insufficient to

warrant a conviction," we, after a careful perusal of the whole record, have become thoroughly convinced that those statements must be attributed to counsel's zeal for their client. The record shows that every legal right of appellant was carefully guarded, and that he suffered no prejudice. Indeed, the evidence is such that the jury might have found him guilty of murder in the first degree.

The judgment of conviction therefore should be, and it accordingly is, affirmed.

McCARTY, C. J., and STRAUP, J., concur.

ON APPLICATION FOR REHEARING.

FRICK, J.

Appellant has filed a petition for a rehearing in which it is urged that we have erred in affirming the judgment of conviction. It is vigorously insisted that we erred in not passing upon the assignment that the trial court erred in refusing to charge the jury, with respect to the extent of punishment, that the law imposes for murder in the second degree and in refusing to hold that the trial court's failure to do so constituted error. In support of that contention it is said:

"The jury were in the dark unless they received information 'outside of the record' as to the punishment of the included offenses. The law seems to be our way under the rule of *stare decisis,* and the point has been deemed important enough to be decided in some cases."

In support of this statement, *State v. Dye,* 44 Utah, 190, 138 Pac. 1193, recently decided by this court, *Brannigan v. People,* 3 Utah, 488, 24 Pac. 767, decided by the territorial Supreme Court, and 21 Cyc. 1071, are cited.

Counsel have manifestly misapprehended the effect of the decisions in the two Utah cases referred to. All that we decided in *State v. Dye* was that, in view of the verdict rendered by the jury in that case, the accused could not possibly have been prejudiced by the court's failure to charge with

respect to the punishment. In deciding that case we purposely refrained from passing upon the question now under consideration for the reason that in our judgment it was not involved. Nor does the decision in *Brannigan v. People, supra,* sustain counsel's contention. A mere cursory reading of that case will convince any one that the judgment was reversed for the reason that the trial court failed to instruct the jury with respect to the law generally, and not because it failed to charge them with regard to the punishment that the statute imposed for the offense charged or for those included therein. An examination of 21 Cyc. 1071, also clearly discloses that the author did not discuss the question now before us at all. What is discussed there is the question of charging the jury with respect to the different degrees, if the offense is divided into degrees. It is true that the author cites one case, namely, *Winkler v. State,* 32 Ark. 539, wherein it is held that the court erred in not charging the jury with respect to the punishment. In Arkansas, however, the statute provides that the jury must fix the punishment, and it follows, as a matter of course, that, under such a statute, it is necessary to inform the jury of the punishment the statute imposes for the particular offense charged or of any included offense of which they may find the accused guilty. All courts agree that this is necessary under such statutes.

Upon the other hand, the question now raised by counsel is discussed in 12 Cyc. 641. It is there said:

"Where the assessment of the punishment is in the discretion of the jury, they should be charged that, if they find the accused guilty, they should assess the punishment."

It is further said, in the same connection, at page 642, that:

"An instruction as to the statutory punishment is properly refused where the jury has no power to fix or to recommend the punishment, and, where no statute confers on the jury the right to assess the punishment, it is not error to tell them that they have nothing to do with the punishment or with the consequences of the verdict, but that they are merely to determine whether or not defendant is guilty."

In 1 Blashfield, Inst. Ju. section 186, the author states. the rule thus:

"In jurisdictions where it is the exclusive province of the court to fix the punishment for the offense with which the defendant is charged, the refusal of an instruction as to the degree of punishment to be meted out to the defendant, if he should be convicted, is proper. The verdict of the jury should not be influenced by any consideration of the degree of punishment, and information with regard thereto is likely to create sympathy or prejudice."

To that effect is the great weight of authority. See State v. Daley, 54 Or. 514, 103 Pac. 502, 104 Pac. 1; *Edwards v. State,* 69 Neb. 386, 95 N. W. 1038, 5 Ann. Cas. 312; *Clary v. State,* 61 Neb. 688, 85 N. W. 897; *People v. Ryan,* 55 Hun, 214-217, 8 N. Y. Supp. 241; *People v. Jordan,*. 125 App. Div. 522, 109 N. Y. Supp. 843; *State v. Peffers,* 80 Iowa, 580, 46 N. W. 662.

Counsel have cited no case, and we have found none emanating from a jurisdiction, where, under the statute, the court must fix the punishment, wherein it was held that a failure or refusal to charge the jury with respect to the punishment constituted error. We, however, are not inclined to hold that in no case and under no circumstances would it be proper for a trial court to charge the jury what punishment the statute imposes in case the jury shall find the accused guilty of the offense charged, or of an included offense, or of a particular degree, if the offense is divided into degrees. While theoretically it is true that the punishment should not influence or affect the question of guilt, yet, as a practical question, it is too well established to be gainsaid that all men, not excluding courts, are constantly influenced by the consequences that may result from their acts, especially where such consequences may affect liberty or life itself. We all know that such consequences may cause men to hesitate and more thoroughly consider and reflect before arriving at a certain conclusion. We think there is much force in the statement made by the New York Court of Appeals in the case of *Keller v. Strasburger,* 90 N. Y. 382, where it is said:

"While a trial judge cannot ordinarily be called upon as matter of right, by either party, to instruct the jury as to the consequences which may flow from their verdict, yet he may, in his discretion, so instruct them. It is frequently important to give the jury such instructions to induce them to greater care in weighing and scrutinizing the evidence, and we cannot say that the judge erred in giving it in this case."

In that case the question of fraud was involved, and the court charged the jury in case they found the defendant guilty of the charged fraud, the court, in addition to the civil consequences of their verdict, was also authorized by law to impose a sentence of imprisonment upon the defendant. The consequences were therefore criminal in their nature and effect. Where, therefore, the evidence with regard to the offense charged is not clear or specific, or is not free from doubt, or consists merely of circumstances, it may well be that such an instruction is proper and should be given, especially so when requested by the accused. In view that in all criminal cases the jury must be satisfied that the accused is guilty beyond a reasonable doubt (that is, to a moral certainty), and in view that the great weight of authority is to the contrary, we do not feel justified in laying down a rule making it error to fail or refuse to charge the jury respecting punishment. The trial court may, however, in its discretion, do so, as before indicated.

In this case, however, and especially in view that the evidence is such that the jury could well have found the accused guilty of the highest degree of murder, no error could have resulted from the court's refusal to charge the jury as requested. It was for this reason that we refrained from passing upon the question in the original opinion. In view, however, that counsel seriously argue in support of the petition for a rehearing that the matter was *stare decisis* in their favor, we have deemed it best to clear up the matter.

The other matters raised in the petition for a rehearing have all been answered in the opinion. It could subserve no good purpose to go over them again and point out once more

wherein counsel's contentions are not sustained either in fact or law.

The petition for a rehearing is therefore denied.

McCARTY, C. J., concurs.

STRAUP, J. (concurring).

Where the jury is not given power to fix the punishment or make a recommendation respecting it, there is ample authority for holding that it is not error to refuse to instruct what the prescribed penalty is for the charged offense. On the other hand, there is good authority for holding that it is not error to so instruct. *State v. Burroughs,* 72 Me. 479; *Miller v. Commonwealth* (Va.) 21 S. E. 499; *Commonwealth v. Harris,* 168 Pa. 619, 32 Atl. 92. I think it the better practice to give the instruction.

One reason urged against it is that the jury, in such case, has nothing to do with the punishment, or with the consequences of the verdict; hence, as stated in 12 Cyc. 642, it has been held by a number of courts that it is not error to charge that the jury has nothing to do with the punishment or with the consequences of the verdict. Of course no one would contend the contrary and that a charge would be proper that the jury had anything to do with the punishment. But to charge that the jury has nothing to do with the punishment, with the judgment to be rendered upon the verdict, and to charge what the penalty is, are two different propositions. If knowledge of what the prescribed penalty is can be considered only for the purpose of determining what the punishment should be, then, of course, should the court not inform the jury what the penalty is. But such knowledge has another legitimate and proper purpose. And this leads to another reason given by courts why such information should be withheld from the jury, which is that in all criminal prosecutions the same quantum of proof—proof beyond a reasonable doubt—is required for a conviction. Hence it is said that the jury in every case, before they can properly convict the accused, must be convinced be-

yond a reasonable doubt of his guilt, regardless of what the penalty may be. These general propositions may be conceded. But it is erroneous to assume that the same weight, degree, and amount of testimony are required in all cases to satisfy the minds of a fair and impartial jury beyond a reasonable doubt. To say that to so satisfy the jury no more certainty, no higher degree, and no greater weight of proof is required in a case where the penalty is death than where it is a mere fine, or imprisonment for several months, is to deny common experience. What might satisfy the minds of a jury beyond a reasonable doubt where the penalty is light or trivial might be wholly insufficient where it is great and severe. Naturally the criminality of an offense and the severity of its punishment have a bearing upon a greater or lesser probability of its commission. In most affairs of life, the weightier the matter in hand the more certainty is required, and the greater is the deliberation before a conclusion is reached. Ordinarily one making an investment of $50,000 in an enterprise requires more proof and greater certainty as to its condition, management, etc., than upon an investment of fifty dollars. That conclusions are properly and justly influenced by consequences resulting from them and by the gravity and importance of the matter in hand cannot be doubted. It is common experience that most men, in dealing with the weightier affairs of life, before reaching a final conclusion, consider the natural and probable consequences resulting from it, and the weightier the affair, and the greater the consequences resulting from the conclusion, the more will the consequences be considered before a final conclusion is reached. I see no good reason why a juror, in considering and weighing testimony, and in deliberating upon his verdict, should be required to act differently. It is unnatural and against common experience to ask him to do so, and it is needless to blindfold ourselves to the natural inquiry of every juror as to what may be done with the accused, if found guilty. In civil actions the jury are informed and well understand the full consequences of the verdict rendered by them. Why withhold it from them in a

criminal case where, under the statute, their general verdict includes questions of law as well as fact? I therefore think it the better practice to inform the jury of the prescribed penalty, not because the jury has anything to do with fixing the punishment, but for the reasons already stated that the criminality of an offense and the severity of its punishment have a bearing upon a greater or lesser probability of its commission, and that naturally more certainty of proof and greater weight and amount of evidence are ordinarily required to satisfy a fair and impartial mind, beyond a reasonable doubt, in a case where the penalty is great and severe than where it is light and trivial.

However, I am of the opinion that the defendant was not prejudiced by the court's failure to so inform the jury in the particulars claimed. The court did inform them of the prescribed penalty for first degree murder. It failed to do so as to second degree murder and manslaughter, necessarily included offenses, and which were also submitted to the jury. On the record the defendant is guilty of murder, or he is not guilty. The jury found him guilty of second degree murder. Though it was proper, as was done, to charge upon all the necessarily included offenses and to submit them to the jury, and though it was within their power to have rendered a verdict finding the defendant guilty of only manslaughter, yet, on the record, I cannot see how such a conclusion could have been reached without disregarding the evidence, for there is nothing whatever shown, either directly, inferentially, or argumentatively, to reduce the killing to manslaughter. The killing, beyond all question, was shown to be murder. That was not disputed, nor was the contrary claimed in either the court below or here. The whole controversy was as to whether the defendant did the killing or aided in the commission of it. The State having shown the killing to be murder, the burden was cast upon the defendant to bring forward whatever there was to reduce the killing to manslaughter. This he did not do. So it is almost inconceivable that, had the jury been told what the

penalties are for second degree murder and manslaughter, a verdict finding the defendant guilty of only manslaughter or not guilty might have been rendered.

For these reasons I think the defendant was not prejudiced, and concur in denying a rehearing.